In the Matter of the ESTATE OF Mary O. NELSON, also known as Mary Olivia Nelson, Deceased. No. 13691.

In the Matter of the GUARDIANSHIP OF Mary O. NELSON. No. 13745.

Supreme Court of South Dakota.

Argued Oct. 13, 1982.

Decided Feb. 9, 1983.

Ronald L. Haskvitz of Smith, Juster, Feikema, Malmon & Haskvitz, Minneapolis, Minn., for contestant and appellee Evelyn Sand and special administrator appellant Clifford Pearson; J. Christopher Cuneo of Smith, Juster, Feikema, Malmon & Haskvitz, Minneapolis, Minn., and David E. Gilbertson of Cameron & Gilbertson, Sisseton, on brief.

L.R. Gustafson, Britton, for proponent, guardian and appellant Allen W. Braaten.

HENDERSON, Justice.

### PROCEDURAL HISTORY

This appeal stems from separate litigation arising in a guardianship proceeding (# 13745) and will contest (# 13691). We have consolidated the two appeals.

On November 24, 1970, Allen W. Braaten, proponent, was appointed the general guardian of Mary O. Nelson. Mr. Braaten served as Mrs. Nelson's guardian until her death on February 22, 1981. Mrs. Nelson died at the age of 84. On March 27, 1981, Mr. Braaten, as executor and legatee, petitioned the Circuit Court of the Fifth Judicial Circuit for probate of decedent's 1975 will. On April 9, 1981, Evelyn Sand, a niece of the deceased, contestant, filed objections and a notice of contest to the 1975 will. On April 14, 1981, Mr. Braaten, as guardian, petitioned another Fifth Judicial Circuit judge for approval of the eighth and final account of the guardianship requesting a termination and discharge of the guardianship.

A will contest was heard from September 14 through September 17, 1981, resulting in a denial of probate for the 1975 will. A special administrator, Clifford Pearson, was appointed on September 28, 1981, to preserve the assets of the estate. On October 1, 1981, Mr. Braaten motioned to reopen the will contest which motion was denied. Findings of fact and conclusions of law were entered on October 19, 1981. Mr. Braaten made a motion for new trial on October 29, 1981. This motion was denied on December 16, 1981. Mr. Braaten, proponent of the 1975 will, filed a notice of appeal to this Court on January 14, 1982.

As to the guardianship matters, a hearing was held on November 18, 1981. Mr. Braaten's final accounting was substantially approved by the trial court on January 18, 1982. The special administrator appealed to this Court on March 15, 1982. Completed briefing and filing on both cases was effected on August 19, 1982. This case was argued on October 13, 1982, at Madison, South Dakota. We affirm the denial of probate of the 1975 will (# 13691) and reverse and remand the guardianship proceeding (# 13745).

### FACTS

Mrs. Nelson, an elderly widow, owned approximately 1400 acres of farmland in Roberts County, South Dakota. Her estate had a valuation of over $935,000 in 1981. Mrs. Nelson, through her attorney William J. Holland, executed wills in 1963, 1966, and 1975. The 1975 will was offered for probate and controversy swirls around its legality.

Mr. Braaten and his family lived across the road from Mrs. Nelson's home. In 1954, Mr. Braaten became a tenant on 520 acres of Mrs. Nelson's property. One-third of the proceeds from crops sold off of this rental property was to be paid to Mrs. Nelson as rent. Eventually, the remainder of Mrs. Nelson's farmland was rented on the same terms to three other tenants, one of them being Mr. Braaten's son.

Mr. Braaten helped Mrs. Nelson with transportation, repairs around the farm, and performed other sundry duties. Mr. Braaten was paid for some, but not all, of his assistance to Mrs. Nelson. In 1970, Mrs. Nelson saw Mr. Holland and told him that

although she desired to remain in control of her property, the management was too cumbersome and she would like a device such as a power of attorney so Mr. Braaten could manage the property. Instead, Mr. Holland and Mr. Braaten encouraged Mrs. Nelson to petition for a general guardianship and to then enter a nursing home. The joint encouragement bore fruit. A general guardianship naming Mr. Braaten as guardian was approved on November 24, 1970. The trial court was not advised of the names of Mrs. Nelson's heirs or relatives. Notice of the guardianship was waived; therefore, Mrs. Nelson's relatives were not informed of what had transpired. It must be noted that Mr. Holland served as Mr. Braaten's attorney in 1963 when he drew a will for Mr. Braaten. In the guardianship proceeding, the trial court found that Mr. Holland was representing both Mr. Braaten and Mrs. Nelson.

In September of 1970, Mrs. Nelson entered a nursing home. Dr. Joseph Kass, in his admitting evaluation of Mrs. Nelson, described her as "senile" and "senile-despondent." Records admitted into evidence establish that Mrs. Nelson's physical and mental condition deteriorated considerably in the nursing home. A daily log kept by the nursing home contains entries indicating Mrs. Nelson had increased senility (September 1972); progressively suffered from vertigo (August 1974); had dizzy spells (throughout 1973–1975); was found on numerous occasions under her bed (January 1974; June 1975); was discovered on the floor of the public restroom (June 1975); was confused regularly (throughout 1973–1975); used a type of wheelchair known as a Geri-chair (1974–1975); was recedent (throughout 1973–1975); and during July through September 1975 often smeared excrement over her body.

Mrs. Nelson's hospital records further reflect entries bearing on a general decline in health. On an August 19–24, 1974, hospitalization, the records reflect: Mrs. Nelson was tied in her wheelchair; was in a daily state of confusion; was unable to make her mind direct her body; constantly smiled although depressed; was very confused and senile; and her communication was limited to "yes," "no," and "fine." Records of a June 30 to July 5, 1975, hospitalization reveal that Mrs. Nelson was a senile person who was in a constant state of confusion and unable to comprehend her brother's death. Finally, records of a March 3 through 25, 1976, hospitalization describe Mrs. Nelson as: incoherent; disoriented; constantly confused; unable to retain information; and unable to answer questions.

However, the witnesses to the execution of the 1975 will, although impeached, testified that Mrs. Nelson was "alert," "very friendly," "knew what she was doing," and was "in sane mind at the time."

Against this evidentiary backdrop of Mrs. Nelson's mental and physical condition, the 1975 will was drafted. On October 30, 1975, Mr. Braaten drove Mrs. Nelson to Mr. Holland's law office. Mr. Braaten remained present in the office, but did not take part, while Mrs. Nelson discussed the new will with Mr. Holland. Mrs. Nelson's 1975 will was designed to revoke her 1966 will. Provisions of the 1966 will devised 80 acres of real estate to Mr. Braaten and $1,000 to Mr. Braaten's wife. The balance of Mrs. Nelson's estate was devised to Mrs. Nelson's family and heirs.

Mrs. Nelson's 1975 will was substantially different. The 1975 will devised 480 acres of real estate and her home to Mr. Braaten plus 121 acres of real estate to Mr. Braaten's son. The remaining real estate was devised to Mrs. Nelson's family. Specific bequests totalling $33,000 were devised to several parties, and the remainder and residue of the estate valued at approximately $232,000 was devised to Mr. Braaten. When this property was devised to Mr. Braaten, he was acting as her general guardian. As executor of the 1975 will, Mr. Braaten was directed by the will to retain Mr. Holland's legal services for probate of the will. The trial court found that Attorney Holland was representing Mr. Braaten when the will in issue was prepared.

During the will contest, evidence of the above-mentioned records was introduced to

substantiate contestant's claims of undue influence and lack of testamentary capacity.

Witnesses testified on proponent's behalf to establish the validity of the making and execution of the will. However, contestant extensively cross-examined and impeached proponent's witnesses. Witnesses to the execution of the will were effectively impeached. The subscribing witnesses were unable to provide the testimony required to support proponent's claim that Mrs. Nelson was competent to sign a will. Their testimony was contradictory. The trial court found that the subscribing witnesses did not understand their duty to be swearing to Mary O. Nelson's competency, but rather only to observe her sign the will; neither could recall being sworn before signing the attestation clause and Maureen Simonson said it was possible that they signed before Mary O. Nelson.

At the conclusion of the will contest, findings of fact and conclusions of law were entered by the trial court. To summarize the holding, the trial court held that testamentary capacity was lacking; undue influence had been established; the will would not be admitted to probate; and Mr. Braaten was dismissed hence so that a special administrator could replace him. Mr. Braaten then attempted to reopen the contest and obtain a new trial; however, both motions were denied.

As to the guardianship, Mr. Braaten did not file his first accounting with the trial court until April of 1974. Eventually, a total of eight accountings were filed by Mr. Braaten. Seven of the accountings were approved by the trial court without notice or contest. However, the eighth and final account, which covered January 1, 1980, through February 22, 1981, was contested by the special administrator.

Mr. Braaten was the only witness at the hearing. Documentary evidence consisted of a handwritten compilation of expenses drafted by Mr. Braaten's son, deposit slips to show income, and cancelled checks to show expenditures. No other records or receipts were introduced. As for income,

there was evidence to establish that rent, as crop proceeds, was collected from Mrs. Nelson's tenants. This was not true for Mr. Braaten who was serving as her guardian. On the expenditure side, Mr. Braaten had difficulty recalling the purpose for which several of the checks were written. Mr. Braaten also testified that he paid his son and wife for running errands, although the price was not set and he could not produce an accounting.

Additionally, from January 1980 through February 1981, Mr. Braaten wrote eleven "cash for Mary" checks for a total of $1,475. Mr. Braaten testified that it was customary for him to give a small amount of the cash from these checks to Mrs. Nelson and personally use the balance for himself. The eighth and final accounting was approved except for the "cash for Mary" items and the payments to Mr. Braaten's wife and son. Five separate issues are presented and treated below. On all five issues, we hold in the negative.

## ISSUES

### I.

WAS IT AN ABUSE OF THE TRIAL COURT'S DISCRETION TO ALLOW CUMULATIVE NURSING HOME AND HOSPITAL RECORDS INTO EVIDENCE TO ESTABLISH DECEDENT'S TESTAMENTARY CAPACITY AT THE TIME OF THE 1975 WILL?

### II.

WAS IT CLEARLY ERRONEOUS FOR THE TRIAL COURT TO FIND THAT THE DECEDENT LACKED TESTAMENTARY CAPACITY?

### III.

IS A REVERSAL MANDATED WHERE THE TRIAL COURT APPROVED A GUARDIAN'S ACCOUNT ON THE BASIS OF THE GUARDIAN'S TESTIMONY, CANCELLED CHECKS, DEPOSIT SLIPS, AND A HANDWRITTEN COMPILATION OF EXPENSES?

### IV.
WAS THE DOCTRINE OF COLLATERAL ESTOPPEL APPLICABLE TO THE GUARDIANSHIP HEARING?

### V.
WAS THE GUARDIANSHIP TERMINATED AND THE GUARDIAN DISCHARGED BY THE TRIAL COURT?

### DECISION

#### I.

■ Proponent contends that the nursing home and hospital records received as evidence were too remote to establish decedent's testamentary capacity of November 1, 1975, when she executed her will. As support for his view, proponent cites *Jones v. S.D. Children's Home Soc., Sioux Falls,* 90 S.D. 126, 238 N.W.2d 677 (1976) and *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970). Factually, *Jones* dealt with a decedent who had fully recovered from a long illness when he executed his will. The Court held the decedent had testamentary capacity. In *Hobelsberger,* six weeks after execution of decedent's will, a guardian was appointed over his estate. However, witnesses testifying as to the time of execution, established decedent's competence in *Hobelsberger.*

Mrs. Nelson's senile dementia is distinguishable from the factual settings in *Jones* and *Hobelsberger.* As set forth in American Jurisprudence 2d:

> Ordinarily, neither capacity nor incapacity is a condition of a single moment, and it is proper for the jury to take into consideration, on the issue of testamentary capacity, the condition of the testator's mind immediately prior and subsequent to the time of the execution of the will.... In fact, in determining whether the mind of the testator was sound at the time his will was executed, it is important to know the condition of his mind a reasonable length of time before and after the execution, especially where the form of mental derangement involved is one such as *senile dementia,* which advances slowly.

79 Am.Jur.2d *Wills* § 117 (1975) (emphasis supplied).

We hold that the nursing home and hospital records herein starkly revealed Mrs. Nelson's expanding senility. Therefore, the records are not too remote on the facts of this case and were properly admitted into evidence.

#### II.

Proponent urges this Court to hold that it was clearly erroneous for the trial court to rule that Mrs. Nelson lacked testamentary capacity to execute her 1975 will. We are unwilling to do so.

■ We draw our "clearly erroneous" standard of review for a will contest from *Matter of Estate of Zech,* 285 N.W.2d 236, 238 (S.D.1979). A finding is "clearly erroneous" when after reviewing all of the evidence we are left with a definite and firm conviction that a mistake was made. *In re Estate of Shabley,* 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971); *see also, Zech, infra* at 244–45 (Henderson, J., dissenting).

SDCL 29–2–3 provides:

> Subject to right of occupancy of a homestead, every person over the age of eighteen years, of sound mind, may execute a will, and ·may thereby dispose of all or any part of his estate, real or personal.

As to the meaning of "sound mind" and an explanation of the burden of proof, *Estate of Podgursky,* 271 N.W.2d 52, 55–56 (S.D. 1978), holds:

> The court has held consistently that for the purpose of making a will, one has a sound mind if able, without prompting, to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property. *In re Corson's Estate,* ... 29 S.D. 14, 135 N.W. 666 [ (1912) ]; *Petterson v. Imbsen,* ... 46 S.D. 540, 194 N.W. 842 [ (1923) ]; *In re Estate of Williams,* ... 88 S.D. 55, 215 N.W.2d 489 [ (1974) ]; *Jones v. S.D.*

*Children's Home Soc., ...* 238 N.W.2d 677 [(S.D.1976)]. The burden rests upon the proponents of a will to establish the testamentary capacity of the testator at the time the will was executed. *In re Estate of Melcher, ...* [89 S.D. 253,] 232 N.W.2d 442 [(1975)].

Additionally, *In re Estate of Anders,* 88 S.D. 631, 636, 226 N.W.2d 170, 173 (1975), holds that the Court looks to mental weakness not bodily weakness. "The law requires soundness of mind, but by this is not necessarily meant that degree of intellectual vigor which one has in youth or that is usually enjoyed by one in perfect health."

 After examining the extensive evidence herein, including Mr. Holland's testimony, we are unable to hold that Mrs. Nelson had testamentary capacity when she executed her 1975 will. The trial court found, by its Finding of Fact number 56, "That at the time she executed her will on November 1, 1975, Mary O. Nelson was unable, without prompting, to comprehend the nature and extent of her property, the persons who were the natural objects of her bounty and the disposition that she desired to make of such property." The weight and value to be given to the evidence in this regard is for the trial court to determine. *In re Houda's Estate,* 76 S.D. 388, 79 N.W.2d 289 (1956). Thus, we hold the trial court's finding in this regard was not clearly erroneous. As Mrs. Nelson failed to have testamentary capacity, we do not reach the undue influence issue. *In re Estate of Melcher,* 89 S.D. 253, 232 N.W.2d 442 (1975).

### III.

 Here, the special administrator contends Mr. Braaten as guardian was not a competent witness and the evidence of accounting was insufficient. SDCL 30–25–28 as amended in 1981 provides:

In rendering his account, the executor or administrator may produce and file vouchers for all charges, debts, claims, and expenses which he has paid, which must remain in the court. The executor or administrator may be examined under oath concerning such payments and also concerning any property and effects of the decedent and the disposition thereof. When any voucher is required for other purposes, it may be withdrawn on leaving a certified copy on file. If a voucher is lost or for other good reason cannot be produced on the settlement, the payment may be proved by the oath of any competent witness.

Substantively, the 1981 amendment replaced "must produce" in the first sentence with "may produce." Thus, the filing of vouchers is now permissive rather than mandatory.

SDCL 30–25–28 is applicable to guardianships by virtue of SDCL 30–26–3. In sum, the special administrator herein asserts that vouchers were lacking, and thereby it was impossible to ascertain if the payments and income were justified or legitimate. On his behalf, the guardian points out that the special administrator did not subpoena any records, and that the administrator rested without producing any witnesses or evidence of his own.

We have examined the question of vouchers under SDCL 30–25–28 in *Matter of Estate of Weickum,* 323 N.W.2d 874, 876 (S.D. 1982), wherein we held: "[T]he rigid requirements imposed upon an executor or administrator regarding the filing of vouchers is no longer applicable."

At the final guardianship accounting, evidence consisted of a handwritten accounting, cancelled checks, bank deposit slips, and testimony of the guardian. On this state of the record, the trial court was able to ascertain that the "cash for Mary" transactions and payments to the guardian's wife and son should be set aside.

In light of *Weickum* and SDCL 30–25–28, the evidence introduced herein was sufficient without the introduction of vouchers.

### IV.

The special administrator asserts that the doctrine of collateral estoppel required that the eighth and final account be held in abeyance until the order in the will contest became final and unappealable. On his be-

half, the guardian contends that collateral estoppel is inapplicable to the eighth and final accounting.

■ Collateral estoppel serves as *issue* preclusion for all issues that were actually fully and fairly litigated in the first lawsuit. Some jurisdictions hold that all issues in the first case cannot be relitigated. While other jurisdictions hold that only those issues which were necessary to the outcome of the first decision cannot be relitigated. In this regard, we held in *Gottschalk v. South Dakota State Real Estate Commission,* 264 N.W.2d 905, 908–09 (S.D.1978) that:

> While res judicata prevents the relitigation of an issue of ultimate fact actually litigated or which could have been properly raised and determined therein, collateral estoppel only prevents the relitigation of issues *actually litigated and determined* in the prior proceeding.

*See also, Schell v. Walker,* 305 N.W.2d 920 (S.D.1981). Another way of viewing collateral estoppel is to say that it compels the second court to make the same finding on an identical issue as the first court made.

■ At the outset, the special administrator's claim that the guardianship accounting must await our resolution of the will contest is untenable. Will contests and guardianship proceedings necessarily involve many issues that do not overlap. Therefore, an examination of the allegedly estopped issues is in order. The special administrator contends that Mr. Braaten's conduct and Mrs. Nelson's mental capacity were litigated and determined in the will contest. Undoubtedly, Mrs. Nelson's testamentary capacity was essential in the first action. However, it is implicit in several South Dakota decisions that testamentary capacity is a specialized concept applicable to probate law. *Anders, supra; Podgursky, supra.* Therefore, a holding on testamentary capacity in a will contest is not conclusive as to mental capacity in a guardianship proceeding as the legal standards are not one and the same.

■ Although some aspects of Mr. Braaten's behavior as Mrs. Nelson's guardian were examined in the will contest on the issue of undue influence, these considerations were not conclusive as to the guardian's eighth and final accounting. The issue of undue influence in the execution of a will necessarily differs from the issue of a guardian's expenditures in an accounting. Moreover, it is noted that a different trial court heard the guardianship matter and did not have all of the evidence pertaining to Mrs. Nelson's mental capacity before it.

## V.

■ Both parties agree that the guardianship was not discharged by the trial court's final order. Yet, this issue is not so easily resolved. On December 21, 1981, the trial court issued a Memorandum Decision which purports to terminate the guardianship and dismiss the guardian. Unfortunately, the trial court's findings of fact and conclusions of law and final order of January 18, 1982, failed to mention either termination or discharge.

SDCL 15–6–52(a), as amended in 1981, provides, in pertinent part: "If an opinion or memorandum of decision is filed, the facts and legal conclusions stated therein need not be restated but may be included in the findings of fact and conclusions of law by reference." Therefore, SDCL 15–6–52(a) does not dispose of this issue because the trial court failed to make reference to the memorandum decision in its findings, conclusions, and order.

In *Mulder v. Tague,* 85 S.D. 544, 549, 186 N.W.2d 884, 887 (1971), we held:

> Standing alone the findings of fact and conclusions of law entered by the court might be considered inadequate and insufficient. However, the trial court's nine-page single-spaced memorandum decision is incorporated in and made a part of the findings and conclusions. This is factually detailed and clearly sets forth the court's application of the law to the facts. Under the circumstances, plaintiff could not be prejudicially harmed and the irregular form of the findings and conclusions constitutes harmless error.

*Mulder* was distinguished in *Talbert v. Talbert,* 290 N.W.2d 862, 864 (S.D.1980), wherein we held:

Finally, plaintiff argues that the trial court failed to enter findings of fact and conclusions of law regarding his financial ability to meet his obligations and his willful refusal to do so. With this we must agree. There were no separate findings of fact at the initial contempt proceeding. The memorandum decision of August 28, 1978, does not suffice for separate findings of fact. In *Mulder v. Tague,* 85 S.D. 544, 186 N.W.2d 884 (1971), we found that the memorandum decision was adequate without separate findings of fact. The *Mulder* case differs from the instant case, however, in that the memorandum decision contained an extensive recitation of the facts and the applicable law as found by the court, and it was specifically incorporated into the findings and conclusions.

Under SDCL 15–6–52(a) and *Talbert,* the trial court having failed to incorporate the memorandum decision by reference, the guardianship was not terminated and the guardian remains to be dismissed. We remand this issue to the trial court for a proper termination and dismissal of the guardianship.

The denial of probate of the 1975 will (# 13691) is affirmed and the guardianship proceeding (# 13745) is reversed and remanded.

All the Justices concur.