347 N.W.2d 347 (1984)
In the Matter of the ESTATE OF Jesse HASTINGS, Deceased.
Lucille LENIUS, et al., Plaintiff and Appellee,
v.
Lillian BRADNER, Defendant and Appellant.
No. 14105.
Supreme Court of South Dakota.
Argued October 24, 1983.
Decided April 18, 1984.
*348 A. William Spiry of Farrar & Spiry, Britton, for plaintiff and appellee.
C.W. Hyde, B. Elizabeth Ganje, Aberdeen, for defendant and appellant.
WOLLMAN, Justice.
This is an appeal from a judgment denying probate to three wills of Jesse Hastings (Jesse). We affirm.
Jesse was eighty-five years of age when he died on May 29, 1982. He was survived by two sisters, Lillian Bradner and Lucille Lenius, and several nieces and nephews. Jesse had executed three wills dated March 25, 1963, January 19, 1976, and June 1, 1981. Lillian, proponent, was named the primary beneficiary in the three wills. She petitioned the circuit court to admit Jesse's 1981 will to probate. Lucille and several nieces and nephews filed an objection on the ground that Jesse was of unsound mind and was under undue influence at the time he executed the will.
Jesse, who had a seventh grade education, had lived on a farm with two bachelor brothers. One of the brothers, Joe, had a mental problem that eventually required his being placed in an institution. Jesse cared for Joe in addition to helping the other brother, Charley, with farm work. Charley was the only one who handled the business affairs.
Charley died on March 6, 1963. There then developed a family rift concerning who should care for Jesse, who moved in with Lillian. On March 30, 1963, Lucille executed a petition alleging that Jesse was incompetent to handle his financial affairs and praying for the appointment of a guardian over his estate. Letters of guardianship over Jesse's estate were issued to the First National Bank of Aberdeen on April 13, 1963. On December 13, 1978, Jesse was admitted to a nursing home in Aberdeen, South Dakota, from which he was released on May 17, 1981. From that time until the time of his death he stayed with Lillian or one of her daughters.
On a Sunday morning in April of 1963, Jesse's brother Sam called attorney L.R. Gustafson in Britton, South Dakota, about bringing Jesse to Mr. Gustafson's office for the purpose of making a will. Mr. Gustafson acceded to this request and met in his office later that morning with Sam and Jesse (according to Mr. Gustafson's recollection, Sam had picked Jesse up on the road inasmuch as he did not have direct access to him). Mr. Gustafson, who was aware of the guardianship of Jesse's estate, made inquiries of Jesse concerning a guardianship over his person. Mr. Gustafson then asked Jesse some questions about his property for the purpose of preparing a will. In Mr. Gustafson's words:
I then asked him how many sections of land he had, and I got no response. I then asked him how many acres he had. I got no response. I asked him how many quarters of land he had. I got no response. I asked him where his land was from his home buildings that he was living in. I got no response.
When Mr. Gustafson questioned Jesse regarding his relatives, "I again could not get direct responses from him, but he would smile and turn to Sam." After attempting to converse with Jesse for approximately one-half hour regarding these and other matters, Mr. Gustafson concluded that he would not prepare a will for Jesse because the answers that Jesse had given him had not satisfied him that Jesse knew what property he had and what he wanted to do with it. In a word, Mr. Gustafson formed the opinion that Jesse was not of sound mind at that time.[*]
*349 Elmer Thurow, the attorney who drafted Jesse's three wills, had no recollection of the signing of the March 25, 1963, will. He recalled the signing of the 1976 will, testifying that Jesse "waswell, just another person who wanted to sign a Will, dressed in ordinary neat clothes, and talked intelligently as far as I could tell." Mr. Thurow also testified that although he had not read the entire 1976 will to Jesse, he had either read or explained to Jesse the paragraph stating Jesse's intention to leave everything to Lillian. Mr. Thurow testified that Jesse indicated that he understood that provision of the will and desired to leave everything to Lillian because she had always done so much for him, or words to that effect.
The 1981 will contained a section identical to one in the 1976 will stating that Jesse had a living brother. Jesse, however, did not have a living brother in 1981. Mr. Thurow testified that he may have copied this section from the former will and that its inclusion in the 1981 will may have been his fault.
On December 27, 1978, Mr. Thurow, who was unaware of the 1963 guardianship, executed a petition on behalf of Lillian requesting that the circuit court appoint her as guardian of Jesse's person and estate. An order so appointing Lillian was entered on December 29, 1978.
Dr. A.C. Vogele, who had treated Jesse since August of 1963, testified by deposition that he did not remember noting any mental problems in Jesse prior to 1972. On June 5, 1972, Jesse was hospitalized in Aberdeen because he was becoming contentious and confused. At the time of his admission Jesse was not oriented as to time and place. Dr. Vogele's diagnosis was "Organic Brain Syndrome, Senile, associated with Arteriosclerosis." Jesse was discharged on June 8, 1972, and sent home with Lillian after showing marked improvement. He was readmitted to the hospital on October 17, 1972, again disoriented as to time and place and unable to respond to normal stimuli. The diagnosis was "chronic brain syndrome with confusional states." Jesse was discharged from the hospital on October 30, 1972. Jesse was again admitted to the hospital on December 8, 1978, because of sleeplessness and lack of control of his behavior at home. He was discharged on December 13, 1978, and admitted that same day to the nursing home referred to above. According to Dr. Vogele, Jesse was definitely confused and disoriented when he was placed in the nursing home but later recovered to his normal condition and appeared to know what he was doing and to know his family and the doctor.
The psychologist who examined Jesse during his hospitalizations in 1972 estimated that Jesse's intellectual level was within average as opposed to retarded ranges. He also testified that at the time of discharge from two 1972 hospitalizations, Jesse "was in good contact with reality, he knew who he was, where he was, what he was doing." The psychologist also testified, however, that Jesse had indicated that he owned cattle. The cattle had in fact been sold in 1963. The psychologist testified that at the time of his last visit with Jesse, December 8, 1972, Jesse's major difficulty was memory function as a result of the organic brain syndrome.
The director of nursing at the nursing home in which Jesse resided testified that at the time of his discharge from the nursing home Jesse was unaware of time and place and was mentally disoriented. In her opinion, Jesse was not of sound mind at that time.
Dan Fritz, an Aberdeen attorney who had served as a trust officer with the First National Bank, met with Jesse some half dozen times during the period from late 1966 to 1970 in connection with the guardianship of Jesse's estate. Mr. Fritz testified that Jesse was always accompanied by his brother Cyril and that he, Mr. Fritz, "only communicated through Cyril. I never communicated *350 about business through Jess. You couldn't."
There was substantial testimony at trial that Jesse never called on a telephone, voted, possessed a driver's license or drove an automobile, and that he talked very little, responding simply "yes" or "no." Jesse apparently could operate older, simpler farm tractors but could not shift gears. He could perform simple farm tasks such as feeding livestock with a pitchfork and repairing fences but could not do more complex tasks such as seeding or planting. There was testimony that Jesse could not read or write, could not count money, could be bossed around by anyone, and did not know the amount of property he owned. Other witnesses testified that Jesse had been of sound mind.
The validity of all three wills was tried in the same proceeding, which consisted of seven days of testimony. At the conclusion of the final day of testimony, the trial court delivered a summary of its findings of fact from the bench. Formal findings of fact and conclusions of law were duly entered pursuant to SDCL 15-6-52(a). The court then entered judgment denying probate of all three wills based upon its conclusion that Jesse lacked testamentary capacity but was not under undue influence at the time he executed the wills.
As the trial court quite correctly observed in announcing a summary of findings from the bench, the facts regarding Jesse's inability to read and write, to carry on conversations, to count money, and other related personal skills, had a bearing on his intelligence but were not the factors that determined his testamentary capacity. Rather, the trial court looked to the evidence concerning Jesse's understanding of the property he owned and the persons who might receive this property. As indicated above, the trial court found that Jesse did not know the objects of his bounty or the extent of his property and therefore concluded that Jesse did not have testamentary capacity at the time he executed the three wills.
All persons over the age of eighteen years and of sound mind may execute a will. SDCL 29-2-3. The proponents of a will bear the burden of establishing testamentary capacity of the testator at the time the will was executed. In re Estate of Melcher, 89 S.D. 253, 232 N.W.2d 442 (1975).
It has been the consistent holding of this court that "for the purpose of making a will, one has a sound mind if able, without prompting, to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property." Estate of Podgursky, 271 N.W.2d 52, 55 (S.D.1978). See also In re Nelson's Estate, 330 N.W.2d 151 (S.D. 1983); Jones v. S.D. Children's Home Soc., 90 S.D. 126, 238 N.W.2d 677 (1976); In re Estate of Melcher, supra; In re Estate of Williams, 88 S.D. 55, 215 N.W.2d 489 (1974); Peterson v. Imbsen, 46 S.D. 540, 194 N.W. 842 (1923); In re Corson's Estate, 29 S.D. 14, 135 N.W. 666 (1912). For the purpose of making a will, soundness of mind does not necessarily mean "that degree of intellectual vigor which one has in youth or that is usually enjoyed by one in perfect health." Peterson v. Imbsen, supra, 46 S.D. at 546, 194 N.W. at 844.
Likewise, mere physical weakness is not determinative of the soundness of mind. Estate of Nelson, supra; In re Estate of Anders, 88 S.D. 631, 226 N.W.2d 170 (1975).
One is not incompetent to make a will because of a limited education and a restricted ability to read and write. See, e.g., In re Estate of Fleege, 89 S.D. 137, 230 N.W.2d 230 (1975). Moreover, "[i]t is not necessary that one should have sufficient capacity to make contracts and do business generally nor to engage in complex and intricate business matters ..." Peterson v. Imbsen, supra, 46 S.D. at 546, 194 N.W. at 844. The fact that a guardian was appointed over a testator's estate does not of itself invalidate a will because of a lack of testamentary capacity. Nor does *351 the fact that a decedent suffered from chronic brain syndrome automatically preclude him from having had testamentary capacity. See, e.g., In re Estate of Walsh, 89 S.D. 342, 232 N.W.2d 850 (1975); In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455 (1970).
In reviewing a circuit court's findings concerning testamentary capacity, we must apply the commands of SDCL 15-6-52(a) that we are not to set aside a trial court's findings of fact unless they are clearly erroneous and that we are to give due regard to the trial court's opportunity to judge the credibility of witnesses. As we stated in In re Estate of Hobelsberger, supra, 85 S.D. at 289, 181 N.W.2d at 459:
In applying the clearly erroneous standard we must bear in mind that our function is not to decide factual issues de novo. The question for the appellate court is not whether it could have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed. Zenith Radio Corporation v. Hazeltine Research Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129.
Our review of the record satisfies us that the trial court correctly applied the above-cited principles of law and that the court did not err in finding that Jesse lacked testamentary capacity.
To conclude, from all accounts Jesse Hastings was a kind, hard working, peaceful, unassuming soul who performed those tasks that were within the capacity that nature bestowed upon him. That the trial court found that he did not possess the comprehension of material and family matters that the law requires as a prerequisite to executing a will is no depreciation of Jesse as a person. That we may have found the facts differently had we heard the testimony is no warrant for us to substitute our judgment for the trial court's carefully considered findings.
The judgment is affirmed.
DUNN, MORGAN and HENDERSON, JJ., and McKEEVER, Circuit Judge, concur.
McKEEVER, Circuit Judge, sitting for FOSHEIM, C.J., disqualified.
NOTES
[*] Although Mr. Gustafson prepared a petition for Sam requesting the appointment of a guardian over Jesse's person, apparently no formal order was ever entered in response thereto. The minutes of the Marshall County Clerk of Courts indicate that Jesse appeared before Judge Nelson in the county court of Marshall County on May 27, 1963, along with Lillian and Cyril Hastings and attorney William J. Holland, who resisted the petition. The minutes indicate that after visting with and questioning Jesse, Judge Nelson continued the hearing until June 17, 1963. The minutes conclude with the entry that: "The Court, at this time, is of the opinion that Jesse does not need guardian of his person." There is no other exhibit in the settled record indicating any formal action by the county court subsequent to May 27, 1963, with respect to this petition. Mr. Gustafson testified that he did not pursue the matter further.