1998 SD 51

### In the Matter of the GUARDIANSHIP OF Harold L. LARSON.

No. 20044.

Supreme Court of South Dakota.

Argued Dec. 3, 1997.

On Reassignment April 1, 1998.

Decided May 20, 1998.

Michael M. Hickey of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for appellee Verlyne J. Larson, guardian of the person and estate of Harold L. Larson.

Sandra K. Hoglund of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for appellants and objectors Kathryn J. Larson Proano and Robert F. Larson.

GILBERTSON, Justice (on reassignment).

[¶ 1.] Kathryn J. Larson Proano and Robert F. Larson (Children), filed objections to the Final Accounting and Report of the guardian of their father's estate. After a contested hearing, the trial court overruled those objections and approved the accounting and discharge of the guardian. Children appeal, alleging inadequate accounting by the guardian and asking that the guardian be surcharged for improper and unexplained expenditures. We affirm.

## FACTS

[¶ 2.] On October 26, 1990, Verlyne J. Larson was appointed guardian of the person and estate of Harold L. Larson, her husband of sixteen years. Verlyne was Harold's second wife. She sought the appointment because Harold was suffering from Alzheimer's disease. By the time of Verlyne's appointment as guardian, the disease had progressed to the point where Harold was unable to manage his business affairs. Verlyne's appointment was strenuously opposed by the children of Harold's first marriage, David, Robert and Kathy.

[¶ 3.] Verlyne's relationship with Harold's children was strained at best. Family discord also stemmed from a suit that David had filed against his father's company, Kreiser's, Incorporated. *See Larson v. Kreiser's, Inc.*, 427 N.W.2d 833 (S.D.1988); 472 N.W.2d 761 (S.D.1991). As a result of these family disputes, David was disinherited.

[¶ 4.] Robert and Kathy remained potential beneficiaries of Harold's assets. Upon Harold's death, his assets were to be placed in trust during the life of Verlyne. Verlyne would receive the income from this trust and the principal of the trust would be distributed to Robert and Kathy when Verlyne died. Verlyne could also consume the principal of the trust if it was needed for her support.

[¶ 5.] At the time of her appointment, Verlyne was directed to file an accounting of all moneys or property received, or under her control, and to make an annual report to the court on the status of such assets and the estate of Harold Larson. Pursuant to that direction, Verlyne filed with the court annual reports for 1990, 1991, and 1992. For the years 1990–1992 she showed expenses for cash expenditures, the three country club memberships and expenditures for attorneys fees. No objections were raised by Kathryn or Robert to these expenditures during 1990–1992. The accountings were reviewed by the court and approved. Nevertheless, for the final accounting period, commencing in 1993, the children found fault with expenditures for the same type of expenses and methods of reporting they had previously acquiesced to.

[¶ 6.] Harold died on May 10, 1994, and Verlyne filed a final account and report of guardian on April 20, 1995, covering the period from January 1, 1993, up until the time of Harold's death. Children filed an objection to the final account because of what they alleged were unexplained, unsupported and

improper expenses, and requests for reimbursement from the Harold L. Larson guardianship estate by Verlyne.

[¶ 7.] These objections boiled down to five basic areas of contention. First, children took issue with cash expenditures which were unaccompanied by individual receipts. These disbursements, which children contend amounted to over $36,000 during a sixteen-month period, were simply noted in a general ledger in their amount without any record of what expenses were covered by them. Verlyne responded to these objections by contending that cash was often required in the community in which they lived in California, especially since Verlyne and Harold were from out of state and still banked in Sioux Falls. Verlyne also testified that $19,500 was spent on the purchase of a car for Harold.

[¶ 8.] Next, objections were made to payments for full country club memberships which historically Harold had extensively used but because of declining health and geography, were now used to a much lesser extent. Verlyne maintained Harold's membership at both the country club near their home in California and also his charter memberships at Minnehaha and Westward Ho country clubs in Sioux Falls, although they had not been back to Sioux Falls for many years. Harold's declining physical condition prevented him from golfing like he had during his healthier days and now only allowed him to chip and putt on limited occasions. Verlyne testified that she felt compelled to maintain the memberships in South Dakota because of Harold's history as one of the original members at Westward Ho and Minnehaha and because of the possibility of returning to Sioux Falls to live. The membership in the California country club was maintained, in Verlyne's view, to maintain Harold's dignity and pride. Harold often dined at the country club in California and, although a less expensive social membership was available, Verlyne wanted Harold to be able to do a little chipping and putting in the middle of the course at his leisure and also ride around in a golf cart without actually playing. She felt this gave him great pleasure.

[¶ 9.] The third area of objection was with regard to payments for travel expenses Verlyne incurred while vacationing without Harold. Verlyne took trips during 1993 and 1994 to Mexico City, Cancun, and Tijuana, Mexico; Houston, Texas; Sacramento and Ontario, California; Amelia Island and Jacksonville, Florida; and Las Vegas, Nevada. Verlyne's travel and theater expenditures during this time period reached over $7,000. Payments for these trips were made both from the guardianship account and from a joint account in which Verlyne commingled Harold's money with her own. Verlyne responded to the objections to the trip expenses by contending that she had placed around $17,000 of her own money in the joint account in 1993 and 1994, which she was entitled to spend. Also, Verlyne maintained that the trips were necessary for her to regain her health and strength after enduring the hardships of caring for Harold.

[¶ 10.] The fourth objection pertained to the purchase of an automobile for $19,500. Robert and Kathy questioned the purchase of the car by the estate when there is no indicia of ownership linking it to Harold or his estate. Verlyne maintained that the car was purchased for Harold because he enjoyed going for drives and the cars otherwise available to Harold were either too small or prone to break down.

[¶ 11.] The last objection pertained to the attorney fees and expenses which were awarded to Verlyne and denied to children who contend fees and expenses were not properly granted to Verlyne because they were not incurred to protect Harold's estate. Instead, they argue, the attorney fees went to protect Verlyne's position as guardian and her inadequate accounting.

[¶ 12.] The court held a hearing and considered the objections raised by the Larson children. The court gave great evidentiary weight to the testimony of Verlyne. Moreover, the court felt that the objections were simply part of an ongoing family feud that the court did not want to continue. The court overruled the objections and approved the final accounting. Children brought this appeal challenging the sufficiency of the ac-

counting and focusing on the five areas outlined above.

## STANDARD OF REVIEW

[¶ 13.] In guardianship proceedings, the trial court's findings of fact are reviewed under the "clearly erroneous" standard. *In re Guardianship of Viereck*, 411 N.W.2d 102, 106 (S.D.1987) (citing SDCL 15–6–52(a)). Under this test, "[w]e will not overturn the trial court's findings unless, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake was made." *Id.* (citing *Wiggins v. Shewmake*, 374 N.W.2d 111, 114 (S.D.1985)).

## APPLICABLE STATUTES

[¶ 14.] The children attempt to apply the wrong law to Verlyne. At the commencement of the reporting period in question, January 1, 1993, the law relied upon by the children did not exist. From January 1 to July 1, 1993, SDCL §§ 30–23–1 through 30–23–3 controlled guardianship accountings. Per SDCL §§ 30–26–3 and 30–25–28, receipts were optional with the trial court rather than required. *See Estate of Nelson*, 330 N.W.2d 151, 156 (S.D.1983); *Estate of Weickum*, 323 N.W.2d 874, 876 (S.D.1982).

1. Making receipts optional was not granting the guardian the opportunity to misuse the ward's funds but merely a recognition that the trial courts were competent to weed out the good from the bad. In *Nelson*, the guardian of an incompetent who was a nonrelative, failed to give the trial court an adequate explanation of entries labeled "cash for Mary (the ward)" and cash payments to the guardian's wife and son. We affirmed the trial court's refusal to approve these unsupported expenditures.

2. SDCL 29A–5–408 is the current statute on accountings for guardianships. It states "[a]n accounting shall include: (2) a listing of receipts, disbursement and distributions from the estate under the conservator's control during the period covered by the account[.]" Contrary to the argument of the dissent, this does not mandate receipts for all disbursements but merely requires their production and listing where they are in the possession of the conservator. The obvious reason for this requirement is for an orderly accounting and to avoid the situation where the conservator' brings to the accounting a sack of receipts for the trial court to sort out and list. Such a listing also is necessary for giving proper notice to interested parties as to the expenditures made by the conservator for

[T]he rigid requirements imposed upon an executor or administrator regarding the filing of vouchers is no longer applicable. This is not to say, of course, that the personal representative of an estate does not owe the highest duty of fidelity to the estate and to the beneficiaries thereof. We are satisfied that the trial court made a painstaking effort to insure that this high standard of fidelity be honored. . . .

*Weickum*, 323 N.W.2d at 876. This standard also applied to guardianships. *Nelson, supra.*[1]

[¶ 15.] On July 1, 1993, SDCL §§ 30–26–3 and 30–25–28 were repealed and SDCL ch 29A–5, the current South Dakota Guardianship and Conservatorship Act went into effect.[2] SDCL 29A–5–103 states:

The provisions of this chapter concerning the filing of reports by guardians and the filing of accountings by conservators *may not be retroactively applied* and prior law shall control as to whether a report or accounting will be required for any period prior to July 1, 1993.

(Emphasis added). Thus, the children are incorrect when they argue it retroactively applies the receipt requirements of SDCL 29A–5–408.[3]

which it seeks court approval. If the Legislature wanted to make receipts mandatory as suggested by the dissent, it certainly knew how to so state as from 1877 until 1981 SDCL 30–25–28 and its predecessors required: " [i]n rendering his account, the [guardian] MUST produce and file vouchers for ALL charges, debts, claims and expenses which he has paid[.]"(emphasis added).

As such, whether this case is decided under the prior SDCL 30–25–28 or the current SDCL 29A–5–408 the result is the same, receipts are not mandatory but the obligation rests on the guardian/conservator to justify to the satisfaction of the trial court that the expenditures were for the proper benefit of the ward/protected person.

3. In accord is SDCL 29A–5–103 which also went into effect on July 1, 1993. It states in part:

This chapter applies to all guardianships and conservatorships in this state, including guardianships created prior to July 1, 1993. Unless otherwise modified or terminated, all guardianships created prior to July 1, 1993, shall remain in full force and effect and all guardians shall retain their assigned powers and duties with respect to either financial or per-

## ISSUE

**[¶ 16.] ARE THE TRIAL COURT'S FINDINGS CLEARLY ERRONEOUS THAT VERLYNE PROPERLY CARRIED OUT HER DUTIES AS GUARDIAN?**

### [¶ 17.] 1. Cash Disbursements

■ [¶ 18.] We hold that the trial court was not "clearly erroneous" in its determination that the $36,905 reported as cash expenditures for Harold's benefit is somehow inadequate reporting. *Viereck*, 411 N.W.2d at 106. This amount was spent over 16 months or $2,307 per month or $77 per day. This amount is hardly excessive for a person's daily expenses for food and other necessities and pleasures, especially those persons of an advanced age and who reside in California. Verlyne would daily take Harold from the nursing home and drive him around, provide him meals at restaurants and bring him to their family home and cook for him there. Is she now to be held wanting because she did not have the foresight to know she supposedly needed receipts for a hamburger, ice cream cone, or a tank of gas? One can readily imagine the difficulty of attempting to make purchases in California on checks drawn on a Sioux Falls, South Dakota bank. Thus, one either attempts to spend this $77 per day with a credit card or with cash.[4]

[¶ 19.] To secure approval by the trial court Verlyne had to testify under oath and be subject to vigorous cross-examination. Also the children had the opportunity to present any relevant evidence they saw fit. The prior accountings were available for the trial court to study. The prior accountings had been approved with no criticism from the children or the trial court. She hardly was a presumptive perjurer who could only be held in check with a paper trail of receipts. Yet, for Verlyne to gain approval of her expenditures, she had to satisfy the trial court she was telling the truth and the expenditures were proper. She cleared all these hurdles and the trial court found in her favor.[5]

### [¶ 20.] 2. Country Club Memberships

■ [¶ 21.] As with their other issues, the children's challenge to Verlyne's decision to maintain country club memberships, one in California and two in South Dakota, was disputed by the children only for the final accounting period. The trial court in rejecting their objection, concluded that Harold "was a longtime member of both country clubs in Sioux Falls and it is therefore understandable that those memberships were not relinquished during his life." The trial court also approved of the country club membership in California.

[¶ 22.] There was the possibility that Harold and Verlyne would return to Sioux Falls. Although suffering from Alzheimer's disease, Harold was not bed ridden until shortly before his death. Prior to his final illness, had he returned to Sioux Falls, he would have used his memberships in the same manner as the one in California. To say after he is

---

sonal decision making except to the extent that the powers and duties under this chapter are broader or more clearly expressed. The provisions of this chapter concerning the filing of reports by guardians and the filing of accountings by conservators may not be retroactively applied and prior law shall control as to whether a report or accounting will be required for any period prior to July 1, 1993. The dissent fails to elaborate how a guardian/conservator under this statute who is given "broader or more clearly expressed" "powers and duties" under the new code, converts jurisdiction of this case from the old guardianship provisions of SDCL 30-25 & 26 to the current SDCL 29A.

4.  Verlyne's practice of "commingling of Harold's funds with her own funds," does not seem so unusual or wrongful when one considers Verlyne was an elderly wife who had always maintained a joint checking account with her husband throughout their marriage. Verlyne testified she also placed $17,000 of her own personal funds into this joint account. Again the trial court considered these facts and found Verlyne's accounting practices, while obviously not perfect, to be within that required by the law.

5.  The dissent claims that "[t]o affirm the trial court in this case, establishes a rule that no meaningful review of the conduct of a fiduciary can ever be performed." Given the numerous instances where fiduciary duties are assumed and performed, to claim without citation to statute or case law that a paper trail is mandatory to hold a fiduciary to his or her obligations, is incorrect. Our established case law is to the contrary. See *Weickum* and *Nelson, supra,* where this Court found no difficulty in conducting such a review.

dead that he did not use them so as to make the expenditures unnecessary, is unjustifiable 20–20 hindsight.

[¶ 23.] Harold was a charter member of Westward Ho and Minnehaha Country Clubs in Sioux Falls and this had been a point of long-standing pride with him. Up until three weeks before his death he made use of the country club membership in California by eating there, putting on the putting green, and riding around the course in a golf cart. Harold maintained his pride by continuing his life-long support of his memberships in South Dakota and still being able to make use of the one in California. Are we now to say that when a person who is no longer fully able to actively participate in an organization which he or she helped found, has belonged to and actively participated in for decades, it is a breach of a fiduciary duty for a guardian to continue to pay membership fees or donations for fraternal, civic, or even religious organizations?[6] What dignity Alzheimer's had not taken from Harold should not be taken from him under such a legal rationale as proposed by Harold's children. We affirm the trial court.

## [¶ 24.] 3. Travel Expenses

[¶ 25.] The court approved of Verlyne's expenditures of guardianship funds for her trips on the theory that Harold and she had established a practice of taking six trips a year and thus Verlyne was entitled to maintain that lifestyle. The circuit court also concluded that Verlyne deserved the vacations to recover from the arduous task of caring for Harold.

[¶ 26.] The travel expenses were carefully reviewed by the trial court which found them justified. At least one of them was to attend a seminar on dealing with Alzheimer's patients. Even if the balance of the trips were recreational, such a respite was justified from the physical and emotional drain of having to take daily care of and meet the ever increasing needs of a spouse suffering from Alzheimer's.

---

**6.** There is no other appropriate explanation for maintaining these memberships. Verlyne obtained no enjoyment from these beyond that of

## [¶ 27.] 4. Automobile

[¶ 28.] Children contest Verlyne's reimbursement for a $19,500 vehicle used to take Harold out for drives. Although it is unclear from the record whether the car was titled in Harold's name and thus an estate asset, the findings of fact approved by the trial court specify that the car will become an asset of the guardianship.

[¶ 29.] The automobile was a justifiable expense as found by the trial court. Harold enjoyed rides to the extent that when Verlyne could not drive him by herself, she hired a driver to provide this pleasure for Harold. We agree with the trial court it was an appropriate expense.

## [¶ 30.] 5. Attorney Fees and Expenses.

[¶ 31.] The final challenge is concerning the matter of attorney's fees. The rule for allowance is:

Attorneys' fees necessarily incurred in the administration of [her] trust or in litigation for the benefit of the estate of [her ward] conducted in good faith and with reasonable care and prudence[.] This rule is stated in the alternative, and should be understood as meaning that if the fees for services of an attorney employed by the [guardian] are necessarily incurred in the administration of the trust, that this is sufficient to authorize their allowance without a showing of benefit to the estate.

*Matter of Estate of Hafferman*, 442 N.W.2d 238, 242 (S.D.1989) (citing *In re Engebretson's Estate*, 68 S.D. 255, 1 N.W.2d 351, 353 (1941); *In re Engebretson's Estate*, 68 S.D. 572, 577, 5 N.W.2d 57, 59 (1942)).

[¶ 32.] As all the expenditures now complained of were found by the trial court to be justifiable, we approve the attorney's fees as being for the benefit of the estate and that it was done in good faith and with reasonable care and prudence. The fees were also necessarily incurred in the administration of the guardianship. SDCL §§ 30–26–3 and 30–25–6. In a case such as this, if we were to construe the statute otherwise and hold to

---

Harold, especially the two memberships in South Dakota provided her with no personal benefit as she was in California.

the contrary on a request for reimbursement for attorneys fees, what spouse will risk having to pay them out of their own funds? The spouse would be more financially prudent to attempt to terminate any assistance with finances for the disabled spouse in favor of outsiders as a form of financial self-defense. Would a corporate trustee take Harold for rides, to the putting green or drive him around the golf course?

### Conclusion

[¶ 33.] Although the procedure followed here falls short of being a model of perfection and we do not recommend it to guardians/conservators and their counsel as a guide to copy, that is not the issue before us. The issue is whether the trial court's findings were clearly erroneous in determining that Verlyne properly carried out her duties as guardian. The trial court heard competing testimony and arguments from Verlyne and the children as to whether the funds were properly used for Harold's benefit. The trial court determined that based upon all of the facts of this case, Verlyne fulfilled her duties as guardian. Based on the record, the findings of the trial court are not clearly erroneous.

[¶ 34.] At the time she became Harold's guardian, Verlyne had been his faithful spousal companion for sixteen years through good times and bad, financially and otherwise. When business and legal reversals sent Harold from millionaire status to that of bankruptcy, she stood by him. Later, she was forced by herself to deal with an even more monstrous family crisis, that of advancing Alzheimer's of Harold with no support or help from Harold's adult children.

[¶ 35.] Although this case constitutes the legal relationship between a guardian and a ward, we should not lose sight of the fact it also deals with a husband and wife which is not only a legal relationship but also a personal and emotional one as well. SDCL 25–1–1. If one is to contemplate the nature and obligations of fiduciary duties, we know of no

guardian nor conservator that takes an oath, "for better for worse, for richer for poorer, in sickness and in health, until death do us part," and proceeds to keep it. Verlyne did.[7]

[¶ 36.] The trial court is affirmed.

[¶ 37.] MILLER, C.J., and KONENKAMP, J., concur.

[¶ 38.] SABERS and AMUNDSON, JJ., concur in part and dissent in part.

AMUNDSON, Justice (concurring in part and dissenting in part).

[¶ 39.] I respectfully dissent as to some of the expenses approved by the majority.

[¶ 40.] As a preliminary matter, the controlling statutory law must be identified. The majority applies SDCL 30–23–1 through 30–23–3 as well as SDCL 30–26–3 and 30–25–28 to this guardianship accounting. However, on July 1, 1993, the prior law was repealed and replaced by SDCL ch 29A–5, the current South Dakota Guardianship and Conservatorship Act. Although the new law specified that it would not have retroactive application to guardianship accountings, SDCL 29A–5–103, that does not mean that accountings for the period after July 1, 1993, do not have to comply with the new law's provisions. In fact, SDCL 29A–5–103 provides that guardians will retain the same duties they had with respect to financial decisions under the prior law except when the duties under the new law "are broader or more clearly expressed."

[¶ 41.] SDCL 29A–5–405 provides, among other things, that the conservator shall "act in the protected person's best interests and exercise reasonable care, diligence, and prudence." SDCL 29A–5–411 echoes that directive in providing that "[a] conservator, in managing the estate, shall act as a fiduciary and in the best interests ... of the protected person." As a fiduciary, "the guardian is bound to manage and conserve the ward's estate in the most advantageous manner; [the guardian] is held to a rigid accountabili-

---

**7.** While not necessary to affirm the trial court, it should not be forgotten that SDCL 25–2–1 states, "[h]usband and wife contract toward each other obligations of mutual respect, fidelity and *support*." (emphasis added). Further per SDCL 25– 2–11 each spouse is obligated to provide the other spouse with "the reasonable value of all the necessaries of life." What constitute necessities depend on the individual facts of the case. *Cf. Ochs v. Nelson*, 538 N.W.2d 527, 530 (S.D.1995).

ty in the execution of [the ward's] trust and is liable for loss occasioned by improper or unlawful expenditures of funds of [the] ward." 39 Am.Jur.2d *Guardian and Ward* § 78 (1968). *See also In re Conservatorship of Stensland,* 526 N.W.2d 485, 486 (N.D.1995) (explaining that "[a] conservator is a fiduciary and, as such, owes a high degree of good faith to the ward, to the estate of the ward, and to other persons interested in the estate."); *In re Guardianship of F.E.H.,* 154 Wis.2d 576, 453 N.W.2d 882, 885 (1990) (stating guardian's duty to manage ward's estate in the ward's best interest must be carried out "in good faith and with the due care and diligence which an ordinarily prudent person exercises in his or her own affairs"). Thus, Verlyne was required to act in the best interests of Harold and in good faith with regard to his estate and interested persons when she assumed the fiduciary duties of guardian.

[¶ 42.] Verlyne routinely withdrew large amounts of cash from Harold's estate and the only accounting of the use of this money consisted of general ledger entries showing the date and amount of the withdrawals. Amazingly, these withdrawals amounted to over $36,000, but Verlyne was not able to provide any receipts, vouchers, or other documentation which would account for any of the money, nor did she explain how it was used to any degree of specificity. The court approved these undocumented disbursements because of the necessity of cash transactions in the community in which the Larsons lived and because this was the usual method of payment in the past.

[¶ 43.] Notwithstanding past practices and the payment methods of the community, Verlyne's fiduciary duties required her to carefully and faithfully account for all expenditures made from Harold's estate during her guardianship over him. SDCL 29A-5-408 requires accountings that include, among other things, "[a] listing of the receipts, dis-

bursements and distributions from the estate under the conservator's control ..." and of "[t]he services being provided to the protected person." A general ledger entry showing only dates and amounts of expenditures falls short of any reasonable interpretation of South Dakota statutory requirements.[8]

[¶ 44.] This Court has upheld the rejection of alleged expenditures from wards' estates when, among other defects, "no specific expenditure of their funds for the benefit of the wards was established" other than one small voucher. *In re Guardianship of Severtson,* 70 S.D. 85, 87, 14 N.W.2d 886, 887 (1944). Other jurisdictions agree that "[t]he conservator must ... keep meticulous accounts of his administration of the estate, accounting for 'the source of every item of income and the purpose of every item of expense'." *In re Estate of Clark,* 237 Mont. 179, 772 P.2d 299, 302 (1989) (citation omitted). "Normally, the account must be supported by receipts for each and every disbursement." Regis W. Campfield, Estate Planning and Drafting ¶ 2357 at 52 (1984) (describing the accounting duty for guardians of incompetents). *See also In re Kosmadakes,* 444 F.2d 999, 1004 (D.C.Cir.1971) (stating that a conservator "like other fiduciaries, is required to make a reasonable showing that an expense she alleges has, in fact, been incurred by her before she may receive therefor credit and allowance"); *In re Conservatorship of Peters,* 447 N.W.2d 412, 414 (Iowa App.1989) (holding that the duty to give a full and accurate accounting requires "as much detail as possible, even if the details are not current and are difficult to obtain"); *Green v. Lombard,* 28 Md.App. 1, 343 A.2d 905, 911 (1975) (holding guardian failed to carry out his "fiduciary duty to keep full, accurate and precise records"). One court, confronting the failure of the conservator to account for cash transactions, held that although "[r]eceipts may be difficult to secure in the quagmire of a family-fiduciary setting ... [they] most often will

8. The majority asks a rhetorical question concerning the need for "receipts for a hamburger, ice cream cone, or a tank of gas[.]" However, the fact that she did not provide *any* receipts for *any* cash expenses is just one consideration. Another consideration must be that she does not even document or begin to explain how she spent the money. The majority also makes allowance

for "the difficulty of attempting to make purchases in California on checks drawn on a Sioux Falls, South Dakota bank." This begs the question of why Verlyne did not use a bank in California for purposes of writing checks; it does not excuse her lack of explanation for her expenditures.

be necessary. Family relationships cannot excuse fiduciary's duty to account for the estate's assets." *In re Guardianship of Willbanks,* 37 Or.App. 795, 588 P.2d 118, 120 (1978) (citation omitted).

[¶ 45.] When, as here, a conservator's descriptions of her expenditures "are insufficient to support any conclusion respecting their necessity or reasonableness, the [conservator] has failed to discharge her duty adequately." *In re Estate of Moore,* 189 Ill.App.3d 920, 137 Ill.Dec. 163, 165, 545 N.E.2d 816, 818 (1989) (citation omitted). There is no way to substantiate Verlyne's claims that the cash was paid out for Harold's care and benefit under the circumstances and I would hold the court's contrary findings approving the accountings as to the cash distributions to be clearly erroneous. To affirm the trial court in this case, establishes a rule that no meaningful review of the conduct of a fiduciary can ever be performed.

[¶ 46.] Furthermore, the inadequacy of Verlyne's method of handling Harold's estate is shown by her commingling of Harold's funds with her own funds. Verlyne admitted that she did not really segregate her money from Harold's money or the money in the guardianship account. Such commingling constitutes a violation of Verlyne's fiduciary duty to Harold's estate. This duty has been described as follows:

> "It is the duty of a guardian to keep his ward's money, property, and investments separate from his own, and, as a general rule, ... a guardian is liable for the loss of funds of the ward which, in any way, are mingled with his own. Thus, a guardian is liable for the loss of funds of his ward where they were so mingled in a deposit with his own funds that it was impossible to distinguish them, or where the particular fund involved was deposited with other trust funds in such a way that it had no earmark to indicate that it belonged to the ward. If the account is in the guardian's name, but other moneys are deposited therein and mingled with those of the ward any balance will be presumed to belong to the ward; and any other claimant, including the guardian, must clearly identify any part of the account in order to claim it."

*Lesnick v. Lesnick,* 577 So.2d 856, 859 (Ala. 1991) (quoting 39 Am.Jur.2d *Guardian and Ward* § 96 (1968)) (alteration omitted). Verlyne voluntarily undertook the obligations of a fiduciary and must not expect to be excused from her duties simply because it is inconvenient to carry them out or because the ward is a member of her family.

[¶ 47.] Verlyne's decision to maintain country club memberships—one in California and two in South Dakota, was disputed by Children. The court concluded that Harold "was a longtime member of both country clubs in Sioux Falls and it is therefore understandable that those memberships were not relinquished during his life." The court also approved of the country club membership in California.

[¶ 48.] I agree with the majority that the court's decision to approve the California country club membership was not clearly erroneous. Harold may only have been able to use the membership in a limited capacity, but he did use it on certain occasions. Also, the maintenance of this membership served Harold's interests in maintaining his pride, dignity, and standing within the community.

[¶ 49.] The memberships in Sioux Falls are another matter, however. Our review of this issue is hampered by inadequate findings as to the best interests of Harold with regard to the country club memberships in Sioux Falls. Verlyne testified that she maintained the full memberships because of Harold's long history at Westward Ho and the possibility that they would go back to Sioux Falls to live again. Children contested the notion that there was any chance that Harold would return to Sioux Falls to live in his deteriorating condition. I would remand to the circuit court for findings as to whether it was in Harold's best interest to maintain the Sioux Falls country club memberships, including the consideration of the likelihood of Harold's return to Sioux Falls and his ability to make use of the memberships if he returned.

[¶ 50.] The court approved of Verlyne's expenditure of guardianship funds for her trips on the theory that she and Harold had established a practice of taking six trips a year and thus Verlyne was entitled to main-

tain that lifestyle. The circuit court also concluded that Verlyne deserved the vacations to recover from the arduous task of caring for Harold.

[¶ 51.] Unfortunately, the court seems to be confusing the benefits granted under Harold's trust, which would go into effect for Verlyne at his death, with the needs of Verlyne for support during the guardianship. As an example of this, the court stated: "I also find that Mrs. Larson is the primary beneficiary of the trust and that ultimately the money is hers to spend." However, this conclusion is premature, since Harold had not died at the time of the expenditures. Had Verlyne predeceased Harold or passed away before she had consumed the trust in its entirety, Robert and Kathy would have received the remainder of the trust. Thus, Verlyne's responsibility was as a guardian of Harold's estate, notwithstanding her position as a potential beneficiary of Harold's trust.

[¶ 52.] According to South Dakota law, Verlyne's responsibility as guardian of Harold's estate meant that she would

apply the income and principal of the estate as needed for the protected person's support, care, health, and if applicable, habilitation or therapeutic needs. A conservator also shall apply the income and principal as needed for the support of any legal dependents who are unable to support themselves and who are in need of support.

SDCL 29A–5–405. Thus, Verlyne should have been required to demonstrate that she was "unable to support" herself and "in need of support" from Harold's estate as a prerequisite to her use of guardianship funds to pay for her personal trips and related expenses. *See also In re Estate of Berger*, 166 Ill. App.3d 1045, 117 Ill.Dec. 339, 347–48, 520 N.E.2d 690, 698–99 (1987), *appeal denied*, 122 Ill.2d 574, 125 Ill.Dec. 216, 530 N.E.2d 244 (1988) (finding when ward's children made no showing of need for support, ward's funds should not have been disbursed to them); *In re Guardianship of Pruitt*, 842 P.2d 771, 773 (Okla.Ct.App.1992) (holding that it is the wife's duty to prove that she is in need of support and without assets of her own before an incompetent husband's assets are used for her support). I would hold that

the lower court's findings allowing the expenditures for Verlyne's trips are clearly erroneous because there was no showing that the trips were for Harold's benefit, nor was evidence presented establishing Verlyne's need for support.

[¶ 53.] Verlyne argues that she also was depositing money in the joint account and, therefore, she should have been able to use these funds for her personal trip expenses if she so chose. Once again, I must point out that this joint account commingled Verlyne's personal funds with those of Harold's. Not only was this money commingled, but Verlyne did not keep any sort of records that would establish how much of the money in the account was actually hers and how much properly belonged to the guardianship estate.

[¶ 54.] The trial court approved of the payment of attorney fees and expenses out of guardianship funds, including those incurred resisting the objections made to Verlyne's final accounting. However, a reasonable reading of South Dakota statutory law mandates that attorney fees may not be awarded in a guardianship proceeding unless the services benefited the estate and were necessary as a result of the actions of the estate's representative. SDCL 29A–5–116. *See also In re Guardianship of Rich*, 520 N.W.2d 63, 69 (S.D.1994); *In re Guardianship of Jacobsen*, 482 N.W.2d 640, 641 (S.D.1992). As I believe the record shows that not all of Verlyne's actions were in furtherance of the best interests of the guardianship, I would hold that it was error for the court to grant all of the attorney fees requested by Verlyne out of the guardianship estate. This is because part of those attorney fees were incurred defending Verlyne's inadequate accounting. This also holds true as to Verlyne's personal expenses incurred in defending against the objections to her final accounting. I would hold the circuit court's findings to the contrary to be clearly erroneous. Since no breakdown of specific attorney activities or the personal expenses of Verlyne has been provided that would enable this Court to determine what activities were in furtherance of the estate's interest and what activities were simply to defend Verlyne's inadequate

accounting, I would remand to the circuit court to make appropriate findings in this regard. There is no question that this case involves a family feud, but in any contested guardianship or estate proceeding this seems to be the general rule. On the other hand, the law does not provide any exception where a family feud dilutes the authority of a court appointed guardian.

[¶ 55.] I am authorized to state that Justice SABERS joins in this concurrence in part and dissent in part.