**William R. CODY, individually and on behalf of all other persons similarly situated, Plaintiff,**

v.

**Carole HILLARD, President of the Board of Charities and Corrections; Frank Brost, Vice President; Ted Spaulding, Member; D.A. Gellhoff, Member; Lyle Swenson, Member; James Smith, Executive Secretary; Herman Solem, Warden of the South Dakota State Penitentiary; sued individually and in their official capacities, Defendants.**

No. Civ. 80–4039.

United States District Court,
D. South Dakota,
Southern Division.

Feb. 17, 2000.

Douglas P. Cummings, Jr., East River Legal Services, Sioux Falls, SD, Elizabeth Alexander, Donna Lee, National Prison Project of ACLUF, Inc., Washington, DC, Thomas W. Clayton, Sioux Falls, SD, for plaintiff.

James E. Moore, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The parties have asked the Court to give its final approval to the Settlement Agreement filed in this case as fair, reasonable, and adequate, and to enter a Final Judgment and Order approving the class settlement and dismissing the class action without prejudice. For the reasons stated below, the Court approves the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e).

Plaintiff filed this lawsuit under 42 U.S.C. § 1983 challenging the constitutionality of numerous conditions of confinement in the South Dakota State Penitentiary (hereafter "SDSP"). The case was certified as a class action pursuant to a stipulation of the parties dated August 23, 1982. On May 31, 1984, the District Court, the Honorable Donald J. Porter, held that various conditions of confinement in the SDSP violated the Eighth and Four-

teenth Amendments to the Constitution. *Cody v. Hillard,* 599 F.Supp. 1025, 1062 (D.S.D.1984), *aff'd in part and rev'd in part,* 830 F.2d 912 (8th Cir.1987) (en banc), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988). On May 29, 1985, the parties agreed to the Court's proposed final order and a partial Consent Decree was entered by Final Order on July 5, 1985. Defendants agreed to make several changes to the conditions in the SDSP, including fire safety, housing, kitchen and food storage, shops and vocational programs, medical and dental care, psychiatric and psychological care, and legal access.

In order to monitor the progress of improvements at the SDSP, the Consent Decree required defendants to submit formal progress reports to the court. In July 1987, the District Court held an evidentiary hearing on defendants' compliance with the Consent Decree. Following the hearing, the Court found that defendants were not in compliance with various health and safety requirements, and therefore appointed a health and safety panel and extended monitoring requirements. In its Order dated November 4, 1987, the Court recognized "the earnest steps taken by the Defendants in addressing the issues raised in this action." Subsequently, plaintiff's environmental expert, Robert W. Powitz, PhD., prepared a progress report dated December 16, 1987, which stated, in part, "Over all, health and safety conditions have improved significantly over the last inspection."

On April 2, 1992, plaintiffs filed a motion seeking further enforcement of the Consent Decree. After an evidentiary hearing in May 1992, the Court found that defendants were not in compliance with certain environmental condition requirements, but noted in an Order dated November 25, 1992, the "great strides made in the past." Subsequently, Dr. Powitz conducted an evaluation to determine defendants' compliance with the Court Order. His report dated April 29, 1993 revealed that defendants had complied with most of the directives in the Court's November 25, 1992

Order, although Dr. Powitz believed a few deficiencies still existed.

There was no further activity in this case until April 16, 1996 when defendants filed a motion to dissolve the Consent Decree and the supplemental enforcement Orders. Plaintiffs opposed this motion and plaintiffs' experts, Dr. Powitz and Armond Start, M.D., conducted inspections of the SDSP in September and October, 1996. Plaintiffs requested an evidentiary hearing on the compliance issues but the District Court, the Honorable Richard H. Battey, declined to hold an evidentiary hearing. On March 13, 1997, Judge Battey issued an Order dissolving the Consent Decree. Plaintiffs appealed. On March 27, 1998, the Eighth Circuit issued an Order of limited remand, retaining jurisdiction and returning the case to Judge Battey to "apply the factors recited in *McDonald* and to enter findings of fact and conclusions of law that will enable us to review its decision."

On May 7, 1998, Judge Battey reassigned the case to this Court. After receipt and review of the parties' proposed findings of fact and conclusions of law and after studying the voluminous file, this Court scheduled an evidentiary hearing for March 30, 1999, to resolve the factual disputes that existed between the parties. On March 17, 1999, the parties filed a Motion for Preliminary Approval of Proposed Settlement Agreement and Approval of Notice to Class. Because the Eighth Circuit retained jurisdiction after remanding the case to the District Court for the sole purpose of rendering findings of fact and conclusions of law on the issue whether the Consent Decree of July 8, 1985 should have been dissolved, this Court sought and received permission from the Eighth Circuit to proceed with the settlement process.

After careful review of the parties' submissions regarding the proposed settlement, on June 3, 1999 the Court entered an Order granting preliminary approval of the Settlement Agreement and setting a

Fairness Hearing for September 27, 1999. In the same Order, the Court approved the final draft of the Notice of Proposed Settlement of Class Action and directed counsel to post the Notice in the housing units of the SDSP, to give individual notice to inmates in the Special Housing Units or in other segregated confinement, to have the Notice read to inmates classified as illiterate, and to have the notice read by interpreters to non-English speaking inmates. In the Notice, class members were notified of the Settlement Agreement terms and of the requirement that they file any objections to the proposed settlement on or before July 21, 1999. The Order provided that copies of the proposed Settlement Agreement would be available for class members to read. The Court also approved a form for class member objections and ordered that the objection form be made available to the class members.

On August 25, 1999, counsel for the parties notified the Court of a minor problem with the notice. In response, the Court issued a revised Order granting preliminary approval of the Settlement Agreement, requiring the parties to post the Notice for an additional 30 days, extending the time for objections to be filed until October 4, 1999 and rescheduling the Fairness Hearing for November 1, 1999. Prior to the Fairness Hearing, the Court received affidavits from three Department of Corrections employees who work at the SDSP detailing the methodology that was used for giving notice of the proposed Settlement Agreement to the class members.

The Court received 39 objection forms, some signed by more than one prisoner. The Court considered all objections that were filed, timely or untimely. Thirteen objection forms related to the Springfield State Prison and one related to the Redfield facility. Springfield and Redfield are not covered by the 1985 Consent Decree and the problems at those facilities are outside the scope of the proposed Settlement Agreement. Approximately 1,200 inmates are housed at the SDSP and the Court received 26 objection forms addressing conditions there. Those 26 objection forms contained 11 complaints about enforceability of the Agreement, 12 complaints about fire safety, 15 complaints about ventilation, 9 complaints about lighting, 12 complaints about food safety, 7 complaints about shop health and safety, and 18 complaints about medical care. The Court selected four inmates to testify at the Fairness Hearing about the issues raised in their objection forms. Between the four inmates, they had objected to each section of the Settlement Agreement.

The Court conducted the Fairness Hearing on Monday, November 1, 1999. The plaintiff class was represented by Elizabeth Alexander of the ACLU National Prison Project ("NPP"), and local attorney Thomas Clayton. The defendants were represented by James Moore. The Court first heard testimony from the four selected inmates who were called individually to the stand and questioned by counsel and then by the Court. Mr. Jeff Crandall is a 36 year old prisoner in the SDSP who completed school through the ninth grade and obtained his GED in prison. He has been incarcerated in the SDSP for 17 years. At the time he filed his objection to the settlement, and at the time of his testimony, Mr. Crandall was housed in disciplinary segregation in the Jameson Special Housing Unit, otherwise known as the "SHU" or the "hole." Mr. Crandall said the Notice of the settlement was passed around to everyone in the Special Housing Unit and he received a copy of the objection form from his counselor. Mr. Crandall had complaints about fire safety, shop health and safety, and medical care, and he also had concerns about enforceability of the Agreement. Mr. Crandall has worked primarily in the print shop at the SDSP, but he picked up packages from and cleaned in all of the industries shops on a regular basis. He observed that, prior to annual inspections by the State Fire marshal, inmates were directed by staff to clean up their work areas and follow safety procedures. For example, Mr. Crandall said that inmates working in the spray booth in the carpentry shop ordinarily left

the spray booth doors open while spraying but, when the fire marshal came, the doors were closed. Mr. Crandall also had concerns about medical care because he received little relief for a shoulder problem until he threatened to file a lawsuit; then he was allowed to have surgery. Finally, Mr. Crandall objected because the proposed settlement does not provide for enforcement by the Court, does not provide for unannounced inspections, and fails to adequately address the need for better medical care.

Bryan Nei, a 36 year old inmate with a GED, was incarcerated in the SDSP from 1989 through 1992 and he began serving his current term of imprisonment there in 1997. He saw the Notice of the settlement on the prison wall and in the library. Mr. Nei complained about ventilation, food safety and medical care at the SDSP. He thought the ventilation system was not hooked up in certain areas of the cellblock for some time, but recently he had noticed some air movement. He also noticed that the exhaust fans in the cellblock are not turned on when they need to be, such as when floor stripper is being used in the cellblocks. Mr. Nei testified that floor stripper is being used incorrectly, causing caustic fumes which make it difficult to breathe, especially when there is no ventilation. He also expressed concern that prisoners were scraping lead-based paint without wearing masks or goggles. He complained about smelly vapors backing up from the cell block drains from caustic acids that are poured down sinks.

Mr. Nei complained about receiving moldy food on occasion and about the cleanliness of the dining room. He also complained about inattentiveness to communicable diseases; he said he was almost double-celled with an inmate with an active case of tuberculosis. He saw another inmate pull his own tooth because he was not allowed to see the dentist quickly enough. Finally, Mr. Nei said that he is receiving inadequate medical care for a hip problem and, as a result, he has filed a lawsuit against prison officials.

Elroy Wabasha, a 42 year old Native American, has been incarcerated in the SDSP since 1977 except for a 10 month hiatus. He obtained his GED in prison. Mr. Wabasha has been in maximum security administrative segregation since June 1997, and that is where he received a copy of the proposed Settlement Agreement and objection form. Thirteen other inmates read and signed the objection form filed by Mr. Wabasha. Although his main concern is enforceability of the Settlement Agreement, Mr. Wabasha also complained about the ventilation, lighting and medical care at the SDSP. He testified that the distribution of hot and cold air in the cellblocks is unbalanced, causing uncomfortable temperatures in the cells. Mr. Wabasha also objected to the policy limiting toilet flushing in administrative segregation to twice per hour because, he said, obnoxious fumes build up in the cells. He testified that the night lights are so bright that he puts a blanket across his bed to block the light. Finally, Mr. Wabasha expressed concern about medical emergency procedures. He said prisoner Joseph Redleaf bled to death following a stabbing in 1992 because the medical staff did not move him from the cellblock soon enough.

Richard Amundson, a 37 year old inmate with a high school diploma, has been incarcerated in the SDSP since December 1997. Prior to that he was in the SDSP from 1983 to 1985 and from 1987 to 1993. At the time he filed his objection form, Mr. Amundson was in the Special Housing Unit in the main SDSP. He was moved into the general population three days before testifying at the Fairness Hearing. Mr. Amundson complained about poor ventilation, particularly when floor stripper and pepper spray were being used because the ventilation did not remove the fumes. He objected to the practice of shining floodlights on the cells in the SHU of the main SDSP twenty four hours a day. Mr. Amundson contended that he became ill after eating stale meat and that he was served stale bread. Finally, Mr. Amundson alleged that several inmates died due

to inadequate medical care, but he only personally observed one of the situations about which he complained—a delay in the evacuation of Mr. Redleaf who died after being stabbed in 1992.

After hearing from the prisoners, the Court heard testimony via telephone from Dr. Powitz, the plaintiffs' environmental expert, regarding his opinion on the proposed Settlement Agreement. Dr. Powitz is a sanitarian, or health inspector, who has worked in the area of correctional institutions since 1969. He was first contacted by the ACLU prison project regarding this case in the early 1980's and has been involved with this case continuously since the beginning. Dr. Powitz inspected the SDSP on the first of many occasions in 1983, and subsequently testified before Judge Porter at the 1983 trial which led to the Court's conclusion that some conditions in the SDSP violated the Constitution. He inspected the SDSP again in 1987 and was appointed to the physical plant panel in 1988. The physical plant panel provided the Court with reports on the improvements being made at the SDSP. Dr. Powitz inspected the SDSP in 1992 and testified about his findings before Judge Porter at a hearing in May 1992. He and the other physical plant panel members prepared a report for the Court after an inspection in 1993 revealed some significant shop safety problems. Dr. Powitz's next inspection took place in October 1996, after defendants filed the motion to dissolve the Consent Decree. He prepared a declaration setting forth his opinions regarding some fire, food and shop safety issues, the need for a comprehensive preventive maintenance program for the ventilation system, and the need for procedures for handling prisoners with tuberculosis. Finally, Dr. Powitz conducted an intensive two-day inspection of the SDSP in February 1999. He met with the physical plant supervisor and interviewed SDSP employees. After the inspection, Dr. Powitz participated in an exit interview with counsel for plaintiffs, counsel for defendants and defendants. Later, Dr. Powitz was involved in settlement discussions between the parties. During his testimony at the Fairness Hearing on November 1, 1999, Dr. Powitz described the health and safety problems he discovered at the SDSP, addressed most of the concerns expressed by prisoners in their written objections and oral testimony, and summarized how the terms of the Settlement Agreement will adequately remedy the environmental health problems he discovered during his 1999 inspection.

The Court also received and reviewed the Declaration of Armond Start, M.D., who inspected the SDSP on behalf of plaintiffs in 1996 and who was consulted by plaintiffs' counsel in development of the medical care provisions of the proposed Settlement Agreement. Presently, Dr. Start is the Medical Director for the Oklahoma Department of Corrections. It is Dr. Start's opinion that the provisions of the Settlement Agreement regarding tuberculosis, if fully implemented, will address a long-standing deficiency in the health care at the SDSP. Dr. Start indicated that the quality control program, the health care contract with Sioux Valley Hospital, and accreditation by the National Commission on Correctional Health Care could not guarantee constitutional standards for health care at the SDSP, but they give some long-term assurances that the health care improvements Dr. Start saw in his 1996 inspection have been institutionalized. Dr. Start stated, by declaration, that the proposed Settlement Agreement addresses all the significant health care issues that were documented in Dr. Powitz's 1999 inspection.

The Court next heard testimony from witnesses called by defendants. Ms. Kay Wilka is the Director of Nursing at the SDSP. Most of her work is administrative. Ms. Wilka testified that the quality improvement program has been in place for seven years and is fully operational. She explained the new procedures for testing prisoners for tuberculosis which were implemented as a result of the proposed Settlement Agreement. Ms. Wilka explained

that the SDSP received accreditation from the National Commission on Correctional Health Care in February 1999 and was nominated for facility of the year.

Dr. Eugene Regier has provided medical care at the SDSP since 1996 and has been the Medical Director for one year. He participates in monthly meetings as part of the quality improvement program. Dr. Regier gave his opinion that prisoners Jeff Crandall and Bryan Nei have not been denied adequate medical care. He explained that the medical staff at the SDSP are waiting to receive copies of Mr. Nei's Mayo Clinic treatment records before determining if further medical treatment for Mr. Nei's hip is necessary.

Dennis Kingsbury is the Director of Food Services at the SDSP. He testified that, pursuant to the Settlement Agreement, all food was stored six inches off the floor and eighteen inches below the ceiling and all food items are stored separately from non-food items. Mr. Kingsbury assured the Court there would be no food storage problems in the future.

Darold Diede has worked at the SDSP since 1983 and has been the Physical Plant Manager since 1997. He described a number of changes defendants have already implemented pursuant to the parties' proposed Settlement Agreement. For example, Mr. Diede testified that fire drills are conducted quarterly on all shifts and that fire self-inspections are conducted monthly. These monthly self-inspections are in addition to the fire inspection conducted yearly by the State Fire Marshal. In addition, there are now more than ten air exchanges per hour in the West Hall shower area and no further deterioration has been observed. Further, in order to comply with the term of the Settlement Agreement requiring increased lighting, a prototype light for the cells in the SHU in the Jameson Annex and the main SDSP has been developed that provides at least 20 foot-candles of light in the cells. Mr. Diede admitted that the prototype light could increase the night light at the main SDSP SHU somewhat. Mr. Diede testified that

for the last year, rather than having inmates scrape lead-based paint, it has been removed by a chemical process which does not pose a health risk. Finally, he indicated that the comprehensive preventive maintenance program for the ventilation system has been implemented and the system is cleaned annually.

Mr. Bill Heim has worked for the South Dakota Department of Corrections since 1982. He has been the head of prison industries at the SDSP since 1991 and is familiar with all shops. Mr. Heim testified that, as a result of the proposed Settlement Agreement, hazard communication training has been implemented in the wheelchair shop and many hazardous chemicals have been eliminated. Oil rags are disposed of properly and vacuum breakers have been installed at the sink hose connection. Mr. Heim indicated that any prison worker required to wear a respirator would first get medical clearance with spirometric evaluation and would be instructed in respirator use.

Mr. Douglas Weber has been the Warden at the SDSP since November 1996. He has worked in the Department of Corrections for 18 years. Warden Weber explained that the DOC has included a budget appropriation for yearly OSHA-type inspections of the SDSP shop areas by the Office of Risk Management. Dr. Powitz testified that these yearly inspections will help prevent future safety problems in the shop areas.

After the Fairness Hearing, the Court received five letters from inmate Bryan Nei regarding conditions at the penitentiary. The Court also received a Verified Complaint from the named plaintiff, William Cody, a portion of which contained complaints about the conditions of Mr. Cody's confinement in administrative segregation. This portion of Mr. Cody's complaint, along with the five letters from Mr. Nei, were sent to counsel who were directed to respond to the allegations. Counsel for plaintiffs stated that Mr. Cody's complaint did not indicate any objection to the

proposed settlement but rather indicates that Mr. Cody seeks individual relief for his conditions of confinement, some of which are not even addressed in the original Consent Decree. (Doc. 616.) Counsel for plaintiffs and defendants had some difficulty responding to Mr. Nei's more general complaints and they believed other complaints were either addressed by the experts or the Settlement Agreement or were not even covered by the original Consent Decree. Defendant contradicted some of Mr. Nei's allegations with affidavits of penitentiary personnel. For example, the second affidavit of David Schiefen and its attachments show that the administration has responded to all 16 of Mr. Nei's requests for administrative remedies. (Doc. 162 at ¶ 2.) The Court notes that Mr. Nei was transferred to Springfield on December 15, 1999 because of problems he was having with another inmate. (Doc. 162 at ¶ 4.) After careful consideration of Mr. Cody's complaint and Mr. Nei's letters, the Court finds no adequate basis to disapprove the Settlement Agreement.

■ In approving a class settlement, the Court must consider whether it is "fair, reasonable, and adequate." *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The Eighth Circuit will not set aside a judicially-approved settlement agreement unless there is a clear showing that the district court abused its discretion. *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1176–77 (8th Cir.1995), *cert. denied,* 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996). Great weight is accorded to the views of the district judge " 'because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.' " *Grunin,* 513 F.2d at 123 (quoting *Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 34 (3d Cir. 1971)).

Before resolving the fairness issue, the Court must ensure that all interested parties were informed of the settlement and had the opportunity to voice their objections. Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." The purpose of the approval procedure is to ensure that the interests of absent class members are adequately protected. *Grunin,* 513 F.2d at 123. The district court acts as a fiduciary who serves as guardian of the rights of the absent class members, and the court may approve a settlement only if the proponents of it show that the settlement is fair, reasonable, and adequate. *Id.*

■ After this Court ordered the parties to provide notice of the settlement to the class members, court-approved notice was posted in two places in the North/ South Unit; in the West Unit; in three places in Unit B in the Jameson Annex; in four places in Unit C in the Jameson Annex; in the penitentiary library; and in the Jameson Annex library. (Doc. 591, Affidavit of David Schiefen.) These places encompass all of the housing units at the penitentiary and the Jameson Annex where general population inmates live. (*Id.*) All inmates in segregation received an individual copy of the notice. (*Id.*) Copies of the Settlement Agreement and the court-approved objection forms were left in both libraries, in the Special Housing Unit, and with Unit Staff at Unit A in the Jameson Annex. (*Id.*) Unit A staff and the staff in the Jameson Special Housing Unit were instructed to give a copy of the proposed Settlement Agreement to any inmate who asked for one. (*Id.*) Penitentiary staff identified 121 inmates as either illiterate or who speak English as a second language. (*Id.*) Each of these inmates was contacted to verify that each had read and understood the Notice. (*Id.*) If one of

these inmates said he did not understand or had not read the Notice, he was asked to read the Notice or it was read to him. (*Id.*) Two Spanish-speaking inmates were read the Notice in Spanish and told that the objection form could be completed in Spanish. (*Id.*) In summary, the Notice informed inmates about the nature of the settlement, the right to file objections, and the parties also provided inmates with forms for filing such objections. (*Id.*) Having reviewed the procedures used to notify class members of the terms of the proposed settlement, and having considered all objections filed and the individual testimony of four inmates at the SDSP who were housed in various areas of the prison when they each received notice of the settlement and filed objections, the Court finds that, pursuant to Fed.R.Civ.P. 23(e), class members have been sufficiently notified of the terms of the proposed Settlement Agreement and the procedure for bringing objections to the proposed settlement to the attention of the Court.

The Court held a Fairness Hearing on November 1, 1999. Although it was not required to do so, the Court allowed four inmates to testify about the objections they had filed. *See Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988) (Rule 23 does not mandate a hearing to allow the inmates to voice their objections personally). The testimony at the hearing assisted the Court with its obligation to fully consider this settlement and to make a sufficient record and enter specific findings to satisfy the Eighth Circuit that the Court has considered the diverse interests at stake and the many factors implicated in determining the fairness, reasonableness, and adequacy of the settlement. *See De-Boer,* 64 F.3d at 1177. Having reviewed all of the information available, the Court is convinced that the interests of the class members as a whole are better served if this prison conditions litigation is resolved through settlement. For the following reasons, the Court finds that the Settlement Agreement reached by the parties is fair, reasonable, and adequate.

■ The factors the Court may examine in deciding whether a settlement is fair, adequate and reasonable are as follows: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *Van Horn,* 840 F.2d at 607. "The single most important factor ... is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Id.* The Court "need not undertake the type of detailed investigation that trying the case would involve," but it must "provide the appellate court with a basis for determining that its decision rests on 'well-reasoned conclusions' and not 'mere boilerplate.'" *Id.* (citations omitted).

### a. Merits of Plaintiffs' Case, Weighed Against Terms of Settlement

■ The Court attributes significant weight to the belief of class counsel that the settlement is in the best interests of the class. Class counsel have argued that the proposed settlement is fair, adequate and reasonable, and have thoroughly explained to this Court the benefits the Settlement Agreement provides to the class. Elizabeth Alexander of the National Prison Project ("NPP"), American Civil Liberties Union, has worked on this case since the original trial in the early 1980's. Ms. Alexander, with the assistance of other attorneys at the NPP, has pursued the class' interests vigorously. Ms. Alexander has broad experience and practice in prison litigation; she briefed and argued *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) and *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). *See Austin v. Pennsylvania Dept. of Corrections,* 876 F.Supp. 1437, 1473 (E.D.Pa.1995). Ms. Alexander worked closely with plaintiffs' experts, Dr. Powitz and Dr. Start, in reaching the terms of the settlement. Dr. Powitz, who has also been involved in the case since the beginning, has inspected the

penitentiary on numerous occasions to monitor conditions and to evaluate compliance with the Consent Decree. Dr. Powitz and Dr. Start also recommend the settlement.

After the Court completed the first draft of this Memorandum Opinion and Order, class counsel notified the Court that they were unable to settle the issue of attorney fees with the defendants. Prior to December of 1995, the parties were able to settle attorney fees and defendants paid plaintiffs at least $140,000 in attorney fees over the course of 12 years. (Doc. 619, Submission in Response to Status Conference.) Apparently defendants posit that plaintiffs now have waived attorney fees because the Settlement Agreement does not provide for fees,[1] and that plaintiffs are not prevailing parties because the result of the Settlement Agreement is dismissal of the case and vacation of the Consent Decree. (Attachment 2 of Doc. 615, Memorandum Regarding Withdrawal of Request to Approve Settlement Agreement.) By Notice filed on January 3, 2000, class counsel revoked their recommendation of the settlement based solely on the fact that defendants have refused to pay plaintiffs' attorney fees incurred since December 1995. (Doc. 619; Doc. 641, Notice of Withdrawal of Request to Approve Settlement Agreement.)

The Court notes that the strong federal policy embodied in 42 U.S.C. § 1988 normally requires an award of fees to prevailing plaintiffs in civil rights actions, including those who have prevailed through settlement. *See Maher v. Gagne,* 448 U.S. 122, 124, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980) ("The fact that respondent prevailed through settlement rather than through litigation does not weaken her claim to fees.") However, there is no motion for attorney fees pending before the Court and the Court is not in a position to rule on attorney fees in the absence of an adequate record with regard

to that issue. It is the opinion of the Court that the parties' failure to settle attorney fees or to include a provision for attorney fees in the Settlement Agreement does not render the Agreement unfair or unreasonable. Class counsel clearly believes that the proposal to settle the merits of this case is more favorable than the probable outcome of a hearing and, as the following discussion indicates, the initial decision to recommend court approval of the Settlement Agreement was made in the best interests of the class.

The proposed settlement addresses the significant health and safety problems identified by plaintiffs' experts and counsel and contemplates the conclusion of court supervision. The issues that have been settled would have required an evidentiary hearing with considerable expense to all parties. Class counsel stressed the difficulty of proving current and on-going constitutional violations in order to reinstate the Consent Decree. Through settlement, the plaintiffs have avoided the risk of losing if an evidentiary hearing is held to determine whether the Consent Decree should have been dissolved. They have also avoided the limited duration of any success under the Prison Litigation Reform Act ("PLRA"): under the PLRA, all relief under the Consent Decree would again be subject to termination in one year. In contrast, in any new litigation affecting the class, relief ordered by a court would not be subject to termination for two years. *See* 18 U.S.C. § 3626(b)(1)(i). Because it provides for dismissal of the action without prejudice, the Settlement Agreement does not preclude an inmate from seeking additional relief. In the future, any class member will be able to file an individual claim or, if appropriate, a class action on the issues covered by the settlement after dismissal without prejudice if the claim was a failure to comply with the Settlement Agreement.

---

**1.** It is undisputed that the Settlement Agreement is silent regarding plaintiffs' right to

recover attorney fees.

Many provisions of the Settlement Agreement contain more specific language than is found in the 1985 Consent Decree. For example, the Consent Decree provides that defendants "shall provide proper initial medical screening for newly admitted inmates" while the Settlement Agreement specifies diagnostic and infection control procedures consistent with Center for Disease Control guidelines. In addition, the Consent Decree states that "adequate ventilation" must be provided in the West Hall shower, while the Settlement Agreement specifies that defendants shall provide at least ten air exchanges per hour. Furthermore, the Settlement Agreement refers to specific federal regulations that defendants must follow, thus establishing specific health and safety requirements. The Settlement Agreement also establishes procedures for continued monitoring of prison conditions. Defendants will continue annual inspections by the South Dakota State Fire Marshall and, as a term of the settlement, defendants already have implemented a new monthly self-inspection for fire safety. Pursuant to the agreement, plans are in process for yearly OSHA-type inspections of all shop areas by the South Dakota Office of Risk Management.

Importantly, as demonstrated by the monthly fire self-inspections, some provisions of the proposed Settlement Agreement go beyond the 1985 Consent Decree and call for improvements not covered by the Decree. The Consent Decree does not address lighting in the Special Housing Unit at the main SDSP, yet the Settlement Agreement provides a specific standard, twenty foot candles, that will be met. Additional areas where the Settlement Agreement provides more relief than the Consent Decree include the tuberculosis isolation provision, the quality control provision, and specific shop provisions, including the Wheelchair Shop which did not exist in 1985.

### b. Defendants' Financial Condition

This factor is not particularly important in the present case because the action is not for monetary damages.

### c. Complexity and Expense of Further Litigation

This case, which presents complex health and safety issues for resolution, was initiated almost 20 years ago and has already consumed a considerable amount of time and resources. If the litigation continues, much more time and money will be spent. The Court finds that this factor weighs in favor of approval of the Settlement Agreement.

### d. Amount of Opposition to the Settlement

The amount of opposition to the settlement was small. The Court received objections from approximately 40 SDSP prisoners (including the 13 inmates who signed Mr. Wabasha's objection form). Warden Weber testified that approximately 1200 inmates are housed at the SDSP, so only approximately three percent (3%) objected to the settlement. It is the opinion of class counsel that the objections presented at the Fairness Hearing do not warrant rejection of the proposed Agreement because many of the objections will be or have been resolved by the settlement, and that the benefits provided to the class by the settlement outweigh the remaining objections. (Doc. 602.)

Eleven objection forms raised concerns about enforceability of the Settlement Agreement without court supervision. As class counsel pointed out in the post-hearing brief, concerns about enforceability of the settlement were to some extent allayed by defendants' hearing testimony showing that compliance with most provisions of the settlement has either been achieved or is imminent. Class counsel indicates that plaintiffs could reinstate the case pursuant to Fed.R.Civ.P. 60(b) if defendants fail to carry out the terms of the Settlement Agreement. (Doc. 602, p. 14.) Counsel

also states that members of the class are better off receiving the benefits of this settlement and pursuing separate constitutional claims, "whether or not covered by the 1985 Consent Decree, in new litigation free of the particularly harsh obstacles that the PLRA places on enforcement of existing orders." (Doc. 582, p. 10.) Furthermore, class counsel believes the Settlement Agreement could be used in future prison conditions litigation attempting to establish defendants' deliberate indifference to an inmate's health or safety, which is an incentive for defendants to comply with the Agreement.

Fire safety concerns were raised in twelve objection forms and Dr. Powitz addressed most of those concerns in his hearing testimony. Some inmates are concerned that the South Dakota Fire Marshal has a conflict in monitoring fire safety at the penitentiary. Dr. Powitz testified that a number of improvements have been made since the Fire Marshal began yearly inspections of the penitentiary and he believes these inspections are very helpful. In order to further ensure fire safety, defendants have begun monthly fire safety self-inspections which Dr. Powitz believes will assist in improving environmental conditions. A few inmates think penitentiary officials should not have advance notice of the Fire Marshal investigations because they believe defendants improve conditions in preparation for the inspection. The Court is concerned with this allegation and it was not addressed by the parties or witnesses at the Fairness Hearing. The Consent Decree does not provide for unannounced investigations. Even though it would seem that the fire safety investigations could be unannounced and still meet security concerns, the difference between announced and unannounced fire safety inspections is not enough to warrant disapproval of the Settlement Agreement.

Many prisoners voiced concerns about the ventilation system, including three of the prisoners who testified at the Fairness Hearing. The complaints ranged from unpleasant odors and lack of air circulation to unpleasant temperatures. Dr. Powitz testified that implementing a preventive maintenance system, cleaning the ventilation system once a year, and balancing the system every six years will ensure that prisoners' health and safety are not jeopardized. These procedures coincide with the requirements for ventilation set forth in the 1985 Consent Decree. Plaintiffs suggest distribution of extra clothing and blankets for inmates in the cold section of the SHU in the main penitentiary.

Section II(A)(8) of the Settlement Agreement provides that the defendants will increase the light available in the SHU at bunk height to twenty-foot candles without increasing the lighting during sleeping hours. A number of inmates contended that defendants have increased lighting at night. At the Fairness Hearing, Darold Diede, the physical plant manager at the SDSP, testified that a prototype light is to be installed in 38 cells in the main SHU which will increase daytime lighting to 21.2 foot candles. A seven-watt bulb will be used for night lighting. Although there has been no change in the wattage of the night light, Mr. Diede said the prototype light may increase the night light in the SHU cells somewhat and he realizes this may be considered a violation of the Settlement Agreement. In the post-hearing brief, plaintiffs' counsel indicated that possible solutions to this problem have been discussed with counsel for defendants but class counsel does not see this problem as an impediment to settlement. In light of counsel's representation and the significant advantages gained by the class through the other terms of the Settlement Agreement, the Court will not disapprove of the settlement because of the possible small increase in night light in the main SHU.

Food safety was a concern raised in twelve objection forms. Most complained about spoiled food or unsanitary conditions. Class counsel indicates that the objections raised do not demonstrate a pattern of non-compliance or a constitutional violation. Each of the food safety con-

cerns that Dr. Powitz documented in his February 1999 inspection are addressed in the Settlement Agreement and the food service director at the SDSP assured the Court that there would be no future problems with food storage.

Shop health and safety raised the fewest objections. Dr. Powitz testified that the provision of the Settlement Agreement calling for yearly OSHA-type inspections by an industrial hygienist selected by the South Dakota Office of Risk Management will address most of the valid shop safety objections that were raised by prisoners, including ventilation, training, and protective equipment issues.

Many prisoners filed objections citing specific circumstances in which they felt the medical care received by them or someone they knew was inadequate. Class counsel points out that although the Consent Decree requires necessary medical and dental care, individuals would need to institute new litigation in order to redress specific instances of inadequate medical care. Dr. Start evaluated the medical and mental health care systems at the SDSP on September 30 and October 1, 1996. (Plaintiff's Fairness Hearing Exhibit 2.) He concluded that substantial improvements had taken place since Sioux Valley Hospital was awarded the medical contract in 1995, but he was not sure whether the improvements would be institutionalized. Subsequently, Dr. Start learned that the SDSP had been accredited by the National Commission for Correctional Health Care (NCCHC), which gave Dr. Start some assurance that the improvements he saw in 1996 have been institutionalized. After Elizabeth Alexander and Dr. Powitz inspected the SDSP in February, 1999, they discussed their findings with Dr. Start who then helped to develop the plaintiffs' proposal for tuberculosis control which has been accepted and implemented by the defendants. Dr. Start opined that if the tuberculosis proposal is fully implemented, "it will address a critical long-standing deficiency of health care at the SDSP and provide effective tuberculosis control consistent with Centers for Disease Control standards for correctional facilities." (Plaintiffs' Exhibit 2 at ¶ 9.) Dr. Start concluded that the Settlement Agreement addresses all the significant health issues that were documented in the 1999 inspection and he believes the health of the SDSP prisoners will be best protected by acceptance of the proposed Settlement Agreement.

For all of the reasons set forth in this Memorandum Opinion and Order, the Court finds that the Settlement Agreement is fair, adequate and reasonable and in the best interest of the class as a whole. The Court reserves ruling on the issue of attorney fees for the plaintiff class. Accordingly,

IT IS ORDERED that the Settlement Agreement is approved pursuant to Fed. R.Civ.P. 23(e) and the case is hereby dismissed without prejudice. The parties are ordered to carry out the terms of the Settlement Agreement.