#29359-a-PJD
**2021 S.D. 54**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE GUARDIASHIP AND
CONSERVATORSHIP OF ALMON G. ADAM,
A Protected Person.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE TAMI A. BERN
Judge

\* \* \* \*

JASON R. SUTTON
DAVID J. HIEB of
Boyce Law Firm, LLP
Sioux Falls, South Dakota

Attorneys for petitioners and
appellants Ronald Adam, Ruth
Reiser, and Rebecca Thaler.


KEVIN J. LOFTUS of
Kennedy, Pier, Loftus
    & Reynolds, LLP
Yankton, South Dakota

Attorneys for conservator and
appellee First Dakota National
Bank.


DANIEL K. BRENDTRO
ROBERT D. TRZYNKA of
Hovland, Rasmus, Brendtro
    & Trzynka, Prof. LLC
Sioux Falls, South Dakota

Attorneys for interested persons
and appellees Roland and
Susan Adam.

\* \* \* \*

CONSIDERED ON BRIEFS
FEBRUARY 17, 2021
OPINION FILED **09/22/21**

#29359

DEVANEY, Justice

[¶1.] In this guardianship and conservatorship action, the conservator filed a motion for approval of a settlement agreement reached in a separate civil action brought by the conservator against the protected person's son and daughter-in-law. Three of the protected person's other children objected to the motion and requested that they be allowed to present live testimony at the hearing on the conservator's motion. The circuit court denied the request but continued the hearing to allow the children to submit affidavits and briefs. After the hearing, the court granted the conservator's motion for approval of the settlement. The objecting children appeal, asserting the circuit court erred in denying an evidentiary hearing and in approving the settlement agreement. We affirm.

### Factual and Procedural Background

[¶2.] Almon Adam has seven adult children: Robin Brooks, Roxanne Evans, Roland Adam, Rebecca Thaler, Ronald Adam, Ruth Reiser, and Ralph Adam. Almon's wife and the children's mother, Joy, passed away from cancer in 1978. After Joy's death, Almon asked Roland to stay on the farm and help with the farming operation and with raising his younger siblings. Roland was 20 years old at the time, and two of the older Adam children were away at college. According to Roland, although he was the one who primarily helped his father, his siblings pitched in, especially as they got older. Eventually, Roland got married and moved away from home, but he continued to farm with Almon.

[¶3.] Being together as a family was very important to Almon. Ruth testified that the family members would gather routinely for holidays, stayed in

-1-

regular communication with each other and with Almon, and for over 35 years, met annually for a family campout at the farm. However, in 2010 or 2011, when Almon was approximately 80 years old, the family dynamic began to change for the worse and became strained over the next several years. By this time, Almon had moved from the farm to a house in Pickstown, South Dakota. Ronald, Ruth, Rebecca, Ralph, Roxanne, and Robin (the six children) felt as though Almon was being less open with them on matters he was normally very open about, including his estate. The six children also became concerned that Roland was trying to alienate Almon from them. Roland spent the most time with Almon, and Almon relied on him for assistance. According to Roland, he would help Almon anytime Almon asked, while his other siblings would not.

[¶4.] In September 2015, Almon's driving privileges were revoked, and without the ability to drive, he could no longer continue taking care of his needs on his own. In October 2015, Almon moved in with Roland and his wife, Susan, while he waited for an opening at an assisted living center in Yankton, South Dakota. Around this same time, Almon hired an attorney, Tim Whalen, to assist him on a number of issues, one of which related to the selling of his house in Pickstown. When Ronald and Robin were visiting Almon, they saw a draft purchase agreement and questioned him about his decision to sell the house. Almon told them that he was selling it to his neighbors, Jeff and June Reinders. Ronald and Robin pressed Almon to give additional details, but he told them he did not want to talk about it further. Thereafter, Robin and Ronald asked Almon's previous attorney to talk to Whalen about whether Almon was competent to handle his affairs, including the

sale of the house. Whalen investigated the children's claims and concluded that Almon was competent. On November 22, 2015, Almon completed the sale of his house in Pickstown to his neighbors.

[¶5.] The six children continued to have concerns that Almon was not able to handle his affairs and that Roland was isolating Almon from the rest of the Adam family. They also had concerns that Roland was improperly influencing Almon's estate planning. They had tried to get information from both Almon and Roland about Almon's finances and estate matters, but neither would answer their questions. Consequently, they obtained counsel in January 2016, who sent Almon and Roland a letter "to try to re-establish mutual respect between all members of this family and avoid litigation." The letter related the children's concerns about various transactions, including the sale of the house, and requested that Almon and Roland provide the closing statement from the sale of the house, a list of gifts and transfers of money and personal property from Almon to Roland since 2011, an itemization of Almon's property stored at Roland's house, and assurances that they would have future access to Almon's personal information. Whalen responded to the letter for both Almon and Roland, and eventually, the family members agreed to hold a meeting. The meeting, at which all seven children and Almon attended, did not resolve the six children's concerns.

[¶6.] In April 2016, Almon, who was then 86 years old, transferred an 18-acre tract of land, called the "horse pasture," to Roland. According to Whalen, Almon had told him on numerous occasions after he began representing him in the fall of 2015 that he wanted to give Roland the horse pasture. On April 6, 2016,

Almon asked Whalen to prepare the deed transferring the land. At this same meeting, Almon indicated to Whalen that he wanted to change his estate plan. Whalen refused to assist Almon with either of these tasks based on his belief that the six children intended to seek a guardianship and conservatorship over Almon. Ultimately, Roland's long-time friend, who worked as the Deputy Register of Deeds for Bon Homme County, drafted the deed and instructed Almon on how to register it. On April 14, 2016, Roland and Almon traveled to the Gregory County Register of Deeds Office, where Almon executed and recorded a warranty deed conveying the horse pasture to Roland. Almon did not tell Whalen about the transfer.

[¶7.] On April 29, 2016, Rebecca, Ruth, and Ronald (the Petitioners) petitioned for the appointment of a guardianship and conservatorship over Almon. They proposed that Ronald be appointed as conservator and Robin be appointed as guardian. Almon, through Whalen, objected to the petition; however, after Almon underwent a medical evaluation, he withdrew his objection. He agreed that he met the criteria for appointment, but he disagreed that either Ronald or Robin should be appointed and proposed his own nominations, including the South Dakota Guardianship Program and First Dakota National Bank.

[¶8.] The circuit court held an evidentiary hearing on February 21, 2017. The six children in favor of the petition testified, giving the circuit court a history of the children's close relationship with Almon and his previous openness about his finances and estate planning. They further testified and offered documentary evidence about specific instances of family discord and why they believed Roland was improperly influencing Almon. Roland and Susan also testified. According to

Roland, Almon relied on him because he could not rely on any of the other children. He also testified that his siblings did not visit Almon frequently when he lived in Pickstown, which upset Almon, and that after he moved to the assisted living center, his siblings visited him even less often.

[¶9.]     At the conclusion of the hearing, the circuit court issued an oral ruling, which was later incorporated in its findings of fact and conclusions of law.  The court found that prior to 2010 or 2011, Almon had a good relationship with all of his children and any favoritism toward Roland "was minimal."  However, the court found that the evidence supported that Roland and Susan "have made a conscious and consistent effort to isolate Almon from the rest of the Family" and "have not encouraged the free flow of information regarding Almon or his estate from late 2010 to present."  The court determined that Roland and Susan were therefore not eligible to act, respectively, as conservator and guardian over Almon.  The circuit court concluded that it would be in the best interest of Almon to appoint Robin as guardian and First Dakota National Bank as conservator, rather than Roland, given the discord in the family related to finances.

[¶10.]     The Conservator filed its initial inventory with the circuit court on June 1, 2017.  The Petitioners objected to the inventory, asserting that it should have included the horse pasture because Almon did not have the capacity to transfer it and because the transfer was a product of Roland's undue influence or of fraud in the inducement or execution.  They also asserted that the inventory should have included a claim against Roland for the return of Almon's cash and personal items based on their recent discovery that after they filed the petition for

guardianship and conservatorship, Almon began withdrawing substantial sums of money from his savings account. The Conservator responded to the Petitioners' objections, indicating it was aware of the transfer of the horse pasture and the missing cash and that it was currently investigating both matters.

[¶11.] On November 29, 2017, the Conservator commenced a civil action against Roland and Susan for rescission of the transfer of the horse pasture and to recover Almon's missing money. On January 17, 2018, Steve Jonas, a friend of Almon's, delivered $40,000 in cash to counsel for the Conservator. In his deposition testimony, Jonas testified that during one of his visits with Almon approximately one year prior, Almon retrieved two duct-taped bundles from his bedroom and gave them to Jonas. According to Jonas, Almon told him the bundles contained money and asked that Jonas hold them for safe keeping until Almon asked for them back. Almon further instructed Jonas not to tell Roland about the money. Jonas explained that he delivered the money to counsel for the Conservator after learning in early January 2018 that the Conservator had brought suit against Roland and Susan.

[¶12.] The Conservator continued to investigate the circumstances surrounding the transfer of the horse pasture and Almon's missing cash. Counsel for the Conservator deposed Almon's friends, the person who drafted the warranty deed for Almon, and Almon's previous attorney, Whalen. Almon's friends and Whalen testified that Almon had repeatedly, and for many years, expressed his desire to give Roland the horse pasture. Relying on the deposition testimony, Roland and Susan filed a motion for summary judgment on the undue influence

claim against them. In support of their motion, they attached notes from another attorney who had met with Almon in 2012 and 2015 regarding his estate plan that included language indicating Almon was thinking of leaving the pasture land to Roland.

[¶13.] In November 2019, the Conservator and Roland and Susan participated in a day-long mediation and successfully reached an agreement. The terms of the parties' agreement provided that Roland and Susan would keep the horse pasture and pay Almon $25,000 in exchange for the dismissal of the lawsuit, including all claims and counterclaims and requests for costs, expenses, and attorney fees.

[¶14.] After the parties' executed the settlement agreement, the Conservator filed a motion in the guardianship and conservatorship action for approval of the settlement. The Petitioners objected, asserting that the settlement "is not in the best interest of Almon and is a breach of the conservator's fiduciary duty to Almon." They argued that "[t]he Conservator is attempting to settle the lawsuit without sufficient discovery, without valuing the horse pasture, and without even deposing Roland and Susan." They further claimed "that the evidence will show that the Conservator did not engage in a good faith analysis of the potential claims against Roland and Susan, including the potential for recovering attorneys' fees and costs." The Petitioners also moved to continue the hearing on the Conservator's motion for approval of the settlement to allow sufficient time for the presentation of live testimony.

[¶15.]     Roland and Susan then obtained permission from the circuit court to participate in the proceedings concerning the Conservator's motion and filed an objection to the Petitioners' motion to continue as untimely and not supported legally or factually. After the hearing, the court issued an order granting the Petitioners' motion to continue, even though the motion was untimely, to allow Petitioners additional time to submit affidavits and briefs. However, the court concluded that it would not take live testimony at the continued hearing; rather, the court would hear argument from counsel for all interested parties. The circuit court held another hearing on March 18, 2020. The court took judicial notice of the record in the collateral civil suit, and after hearing arguments from counsel, the court took the matter under advisement.

[¶16.]     On May 21, 2020, the circuit court issued a letter decision and order granting the Conservator's motion for approval of the settlement. The court noted that the Conservator had investigated the land transfer and that evidence in the record from multiple non-family witnesses, including Almon's neighbors, friends, and legal counsel, suggested that it was Almon's long-time plan to give the horse pasture to Roland. The court also noted that Roland and Susan had filed a summary judgment motion in the civil suit, which was still pending at the time the parties entered into the settlement agreement. The motion asserted that the Conservator could not make a prima facie showing that the transfer of the horse pasture was the result of Roland's improper influence. In the court's view, although Roland's participation in the transfer gave rise to a presumption of undue influence, "[t]he overwhelming evidence suggests the transfer was what Almon wanted and

had planned on for many years." The court further considered the significant attorney fees already expended by the Conservator and the prospect of incurring additional fees in prosecuting the claim. Ultimately, the court concluded that "[t]he settlement is fair, reasonable, free from fraud and collusion and is in the best interests of Almon."

[¶17.] The Petitioners appeal, asserting that the circuit court erred in granting the Conservator's motion for approval of the settlement and in approving the settlement without conducting an evidentiary hearing on their objections.

## Analysis and Decision

### *This Court's Standard of Review*

[¶18.] The parties each note in their respective briefs that this Court has not before identified the applicable standard for reviewing a circuit court's decision on a conservator's motion for approval of a settlement agreement. However, they all recognize the inherent discretion afforded to circuit courts in ruling on guardianship and conservatorship matters and, therefore, suggest that we review the circuit court's decision to grant the Conservator's motion for an abuse of discretion. *See, e.g.*, *In re Conservatorship of Gaaskjolen*, 2014 S.D. 10, ¶ 9, 844 N.W.2d 99, 101 (providing that "[w]e review a circuit court's decision to appoint a conservator for an abuse of discretion"); *In re Guardianship of Stevenson*, 2013 S.D. 4, ¶ 22, 825 N.W.2d 911, 916 (stating that we review the court's decision to remove a guardian and conservator for an abuse of discretion).[1] We agree. SDCL 29A-5-419 gives a

---

1.  Although the Petitioners agree that an abuse of discretion review applies, they note that we have also said that we review the circuit court's findings of
(continued . . .)

circuit court discretion to authorize, instruct, or ratify actions, proposed actions, or omissions of the Conservator, and here, the court's knowledge of what had transpired in the underlying guardianship proceeding might very well have impacted the court's assessment of whether the settlement should be approved. Therefore, we review the circuit court's decision for an abuse of discretion.

### The Circuit Court's Standard for Reviewing a Settlement Agreement

[¶19.]    The parties dispute the standard under which *the circuit court* was to decide the Conservator's motion for approval of the settlement.  The Petitioners direct this Court to class action and bankruptcy cases for the proposition that the party seeking approval of a settlement must show by a preponderance of the evidence that the proposed settlement is fair, reasonable, and adequate and in the best interest of the protected person.[2]  *See, e.g.*, *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017); *In re Y-Knot Const., Inc. v. First Int'l Bank & Trust*, 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007); *Maher v. Zapaa Corp.*, 714 F.2d 436, 454 (5th Cir. 1983); *Cody v. Hillard*, 88 F.Supp.2d 1049, 1056–57 (D.S.D. 2000).  They further note that

---

(. . . continued)

> fact in guardianship proceedings for clear error.  *In re Conservatorship of Irwin*, 2007 S.D. 41, ¶ 14, 732 N.W.2d 411, 414 (quoting *In re Guardianship and Conservatorship of Miles*, 2003 S.D. 34, ¶ 11, 660 N.W.2d 233, 236; *In re Guardianship of Larson*, 1998 S.D. 51, ¶ 13, 579 N.W.2d 24, 27).  However, the clearly erroneous standard is not implicated here because we do not deem the circuit court's consideration of various factors in determining whether to approve the settlement as findings of fact per se.

2.    In class action cases, to determine whether the settlement is fair, reasonable, and adequate, courts examine: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement."  *Cody*, 88 F.Supp.2d at 1057.

when considering the reasonableness of a settlement, courts should consider "the likely outcome of the litigation" in comparison "to the amount of the settlement." *See, e.g.*, *Desmoulins v. City of New York*, 394 F.App'x 785 (2d Cir. 2010) (comparing "likely rewards of litigation" with the terms of the settlement).

[¶20.] In contrast, Roland and Susan crafted a proposed test drawn from provisions in SDCL title 29A and their adaptation of factors employed by appellate courts in reviewing bankruptcy and class action settlements. Under their proposed test, a court would consider the deference afforded to conservators, the protected person's express desires and values, the circumstances surrounding the settlement (e.g., whether it was the product of arm's-length negotiations and free from fraud or collusion), and the range of a reasonable settlement in light of factors such as the complexities of the litigation, the probability of success, and the difficulties in collecting a judgment.

[¶21.] The Conservator maintains that the circuit court applied an appropriate standard when it determined the settlement "is fair, reasonable, free from fraud and collusion and in the best interests of Almon." The circuit court had quoted a secondary source for the proposition that "a conservator, acting reasonably and in an effort to accomplish the purposes of the appointment," may settle a lawsuit. *See* 39 Am. Jur. 2d *Guardian and Ward* § 122 (2021). The court also relied on cases from other jurisdictions in which courts have upheld the conservator's decision to settle when the conservator exercised "sound judgment in doing so," *see Hays v. Heinz*, 58 N.E.2d 146, 148 (Mass. 1944), and "acted in good faith, and with reasonable prudence," *In re Guardianship of Sorrells*, 117 P.2d 96, 102 (Ariz. 1941).

Finally, the circuit court referenced the four factors applied by the Eighth Circuit Court of Appeals in bankruptcy cases (as suggested by Roland and Susan) for "assessing whether the proposed settlement fits within the range of reasonableness[.]" *Y-Knot*, 369 B.R. at 408.

[¶22.]     The trustee's role in a bankruptcy case is somewhat analogous to a conservator's role in that a conservator, like a trustee, must act in the best interest of the protected person and the protected person's estate. *See, e.g.*, SDCL 29A-5-405 (providing that the conservator must "to the extent known, consider the express desires and personal values of the protected person when making decisions, and shall otherwise act in the protected person's best interests and exercise reasonable care, diligence, and prudence"); SDCL 29A-5-411 (providing that the "conservator, in managing the estate, shall act as a fiduciary and in the best interests of the minor or protected person"). Thus, like the circuit court, we find the bankruptcy cases to be instructive.

[¶23.]     Just as parties seeking approval of a settlement agreement in a bankruptcy case must establish that the proposed settlement is in the best interest of the estate, conservators have the burden of proving that a decision to settle was in the protected person's best interests. However, this does not mean that a conservator is required "to establish that the proposed settlement is the best possible outcome[.]" *See Y-Knot*, 369 B.R. at 408; *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997). Rather, as the bankruptcy cases explain, the party seeking approval of the settlement must show "only that it does not fall below the lowest point in the range of reasonableness." *Y-Knot*, 369 B.R. at 408. Also, in considering

-12-

whether the parties have met their burden, a circuit court should not substitute its judgment for that of a conservator who, in acting as the protected person's fiduciary, is to make decisions consistent with what the protected person would want and in the protected person's best interest. *See, e.g.*, *In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr. E.D. Mo. 1988) (observing that the trustee in bankruptcy "is a fiduciary, responsible for managing the affairs of the debtor for the benefit of parties with an interest in the debtor's estate").

[¶24.] Ultimately, we conclude that a circuit court should, as the court did in this case, determine whether the conservator acted with sound judgment, in good faith, and with reasonable prudence in determining that the settlement is fair, reasonable, and in the best interest of the estate. In doing so, the court may consider many matters, including the probability of success in litigation, the complexity of the litigation, attendant expenses, and the circumstances surrounding the negotiation process.

***Whether an Evidentiary Hearing was Required***

[¶25.] The Petitioners contend that the circuit court erred in denying them an evidentiary hearing because, in their view, a decision to approve a settlement over an objection of an interested party requires the consideration of evidence and testimony on the pertinent facts.[3] In response, the Conservator maintains that the

---

3. Petitioners further contend that because there was no live testimony, the court erred, similar to when a court errs by weighing evidence in deciding a summary judgment motion, when it weighed the evidence from the collateral lawsuit. *See, e.g.*, *Powers v. Turner Cnty. Bd. of Adjustment*, 2020 S.D. 60, ¶ 22, 951 N.W.2d 284, 293 (indicating "that a court is not to weigh the evidence at the summary judgment stage"). The Petitioners' comparison of the court's

(continued . . .)

circuit court "enjoys broad discretion to demand information upon which the court assesses the past or proposed actions of [a] conservator."

[¶26.] This Court has not before examined a circuit court's decision to deny interested persons an evidentiary hearing on an objection to a motion for approval of a settlement filed in a guardianship and conservatorship action.[4] SDCL chapter 29A-5, also known as the South Dakota Guardianship and Conservatorship Act (the Act), governs the administration of guardianships and conservatorships. Relevant to the question at issue, we note that the Act provides a conservator with broad authority to act and the circuit court with wide discretion in ensuring that a conservator is properly managing the protected person's financial affairs. *See, e.g.*, SDCL 29A-5-411 (identifying certain powers the conservator may exercise without prior court authorization, including the settlement of a lawsuit brought on behalf of

_____

(. . . continued)

decision here to a decision on a summary judgment motion misses the mark. Settlements, by nature, involve underlying lawsuits where facts are disputed; therefore, the determination that must be made by a court when deciding whether to approve a settlement does not implicate the question before the court in summary judgment proceedings, i.e., whether there are material facts in dispute. Rather, in deciding whether to approve a settlement, the circuit court, as it did here, considers the evidence identified by the parties for the purpose of weighing the potential risks of proceeding to trial against the potential likelihood of success.

4. Although this Court has not addressed the *denial* of an evidentiary hearing in a guardianship proceeding, we have reversed a circuit court's approval of a conservator's power to redraft a protected person's will where the court failed to make "specific factual findings based on evidence in a fully developed record. . . ." *In re Guardianship of Nelson*, 2017 S.D. 68, ¶ 18, 903 N.W.2d 753, 758. However, *Guardianship of Nelson* addressed the requirements of SDCL 29A-5-420, a statute providing that a court may authorize a conservator to exercise specific powers—none of which are on point here— only after considering a number of factual matters specifically delineated in the statute. *See id.* ¶ 16.

the protected person); SDCL 29A-5-419 (providing that the court may limit or grant additional powers to a conservator and that a conservator may seek court authorization or ratification for any actions).

[¶27.] Notably, although the conservator has broad authority to act, if a conservator settles a lawsuit, the conservator would be required to identify such in the annual accounting filed with the circuit court and mail a copy to the individuals and entities entitled to notice of the original petition. *See* SDCL 29A-5-408. Importantly, those receiving notice would have an opportunity to object to the accounting within fourteen days of receipt of notice and "[u]pon filing an objection, any interested person may request a hearing on the accounting." *Id.*

[¶28.] Although this case does not concern an objection to an accounting, the statutory procedure governing such objections is nevertheless instructive on the question whether the Petitioners were entitled to a full evidentiary hearing on their objections to the Conservator's motion under SDCL 29A-5-419. If, on an objection to an accounting, an "interested person may request a hearing on the accounting[,]" *see* SDCL 29A-5-408, it is logical to conclude that on an objection to the Conservator's motion here, the Petitioners, as interested persons, could request a hearing. However, the opportunity to request a hearing does not necessarily mean that the circuit court must allow witness testimony at the hearing, and nothing in SDCL 29A-5-408 or chapter 29A-5 indicates such a requirement.

[¶29.] Outside the context of guardianship and conservatorship actions, but further instructive, the Eighth Circuit Court of Appeals determined, in considering a settlement of a class action lawsuit, that a provision requiring that notice be given

to all members of the class does not likewise require that the court hold a hearing to allow class members to voice objections personally. *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988). The court explained that "such a hearing would eviscerate the efficiency of a class action." *Id.* The Fifth Circuit Court of Appeals similarly observed that a "court does not need to 'open to question and debate every provision of the proposed compromise,' and it may 'limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" *Union Asset Mgmnt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641 (5th Cir. 2012) (citation omitted). The Sixth Circuit Court of Appeals likewise noted that "no court of appeals, to our knowledge, has demanded that district courts invariably conduct a full evidentiary hearing with live testimony and cross-examination before approving a settlement." *Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615, 636 (6th Cir. 2007). Rather, courts "have instead deferred to the district court's traditionally broad discretion over the evidence it considers when reviewing a proposed class action settlement." *Id.*

[¶30.] The Petitioners, however, claim that even if a court has discretion in deciding whether to hold an evidentiary hearing on a motion to approve a settlement, the circuit court abused its discretion when it denied their request for such a hearing. They assert that the court's decision to approve the settlement was "an inherently factual analysis[,]" and the court could not adequately assess the Conservator's decision to enter into a settlement agreement by reviewing information in affidavits that was not subject to cross-examination. They further claim that because they were not parties to the collateral civil suit, they should

have been given an evidentiary hearing "to explore, through cross-examination, what evidence was discovered through discovery and why Conservator FDNB agreed to compromise the claims like [it] did." Finally, the Petitioners contend that an evidentiary hearing should have been granted because of the potential res judicata effect of the court's order on a future claim by the Petitioners against the Conservator for breach of fiduciary duty.[5]

[¶31.] "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against[,] reason and evidence." *St. John v. Peterson*, 2011 S.D. 58, ¶ 10, 804 N.W.2d 71, 74 (citation omitted). This Court has further said, "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable.'" *Graff v. Children's Care Hosp. & School*, 2020 S.D. 26, ¶ 13, 943 N.W.2d 484, 488 (citation omitted).

[¶32.] Here, the Petitioners are essentially asking this Court to remand for the circuit court to hold a mini trial on the merits of the collateral civil suit. But the

---

5. The Petitioners rely on *AmSouth Bank v. Cunningham* for the proposition that objectors like them are entitled to "their 'day in court.'" *See* 253 S.W.3d 636, 644 (Tenn. Ct. App. 2006). In particular, they quote the following phrase: "even in conservatorship matters, interested parties who file petitions and demand hearings are generally entitled to their so-called 'day in court' unless the matter is moot, frivolous, barred by the doctrine of *res judicata*, or as in matters of summary judgment, the material facts are not disputed or a party is entitled to relief as a matter of law, in which event an evidentiary hearing may not be necessary." *Id.* However, this quoted language pertains to whether a hearing should have been granted on a motion to remove AmSouth as co-conservator under Tennessee statutes, which differ from statutes in SDCL chapter 29A-5. Moreover, the appellate court determined that under the governing Tennessee statute, the lower court is to conduct a hearing but noted that "the statute does not prescribe the type of hearing or the timing of the hearing[.]" *See id.* at 643.

Conservator's motion for approval of the settlement does not implicate such a trial-like process. Therefore, a court is not required "to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement." *Martin*, 212 B.R. at 319. This same notion should likewise apply in examining a conservator's decision to settle—a circuit court need not conclusively determine the merits of the claims settled.

[¶33.] Moreover, although the court denied the Petitioners' request for an evidentiary hearing, it granted their untimely motion to continue the hearing specifically to afford the Petitioners additional time to submit affidavits and briefs in support of their objections. The Petitioners then submitted affidavits of Ronald, Ruth, and Rebecca, along with the following exhibits: depositions taken in the underlying civil suit; two reports from evaluations of Almon filed in the guardianship and conservatorship matter; and copies of email communications between counsel for the Petitioners, for the Conservator, and for Roland and Susan. Therefore, even without an evidentiary hearing, the circuit court considered the Petitioners' asserted facts submitted via affidavits in assessing the overall prosecutorial merit of the underlying lawsuit. The Petitioners have not established that the circuit court abused its discretion in denying their request for a full evidentiary hearing on their objection.

***Approval of the Settlement Agreement***

[¶34.] The Petitioners further contend that the circuit court abused its discretion by approving a settlement that released all claims and ratified Almon's

transfer of the horse pasture to Roland, which the Petitioners valued at $150,000, in exchange for a payment of $25,000 from Roland and Susan to Almon.[6] They contend that had the Conservator prevailed in the lawsuit against Roland and Susan, it could have obtained a judgment against them for as much as $275,000 (representing the value of the land improperly transferred, cash withdrawn from Almon's account, and the estate's estimated attorney fees). In their view, a $25,000 settlement was not fair, reasonable, or in the best interest of the estate.

[¶35.] The Petitioners also argue that the settlement was clearly unreasonable in light of the undisputed evidence supporting that Roland and Susan exerted undue influence over Almon. In particular, they assert that the overwhelming evidence in the record supports that: (1) Almon had diminished capacity making him susceptible to undue influence; (2) Roland and Susan made significant and increasing efforts to influence and alienate Almon; and (3) the transfer of the horse pasture and withdrawal of Almon's cash were the product of their undue influence.

[¶36.] From our review, the circuit court properly considered whether the Conservator acted with sound judgment, in good faith, and with reasonable prudence in determining that the settlement is fair and reasonable and in the best interest of the estate. The circuit court "canvass[ed] the issues" and analyzed appropriate factors revealing why this settlement did not "fall 'below the lowest

---

6. In support of their objection to the Conservator's motion, the Petitioners attached as an exhibit a comparable market analysis from an associate broker of a real estate company recommending that the horse pasture could be listed at $125,000 on the low end and at $150,000 on the high end.

point in the range of reasonableness.'" *See, e.g.*, *Martin*, 212 B.R. at 319. In particular, the court recognized that Roland's participation in the transfer gave rise to a presumption of undue influence, but the court also noted that the Conservator's investigation of the transfer of the horse pasture and the missing money led to evidence from multiple witnesses that Almon had a long-standing desire to transfer this land to Roland. Given the considerable evidence in the record suggesting that "the transfer was what Almon wanted and had planned on for many years," the court did not err in its assessment that the Conservator may not have prevailed in proving to a jury that Roland in fact exerted undue influence as to this particular transaction.

[¶37.] Even if the suit had gone to trial and was resolved against Roland and Susan, the estate could have incurred significant additional attorney fees advanced by the Conservator to pursue the litigation. *See* SDCL 29A-5-116 (providing that a conservator and the conservator's attorney "are entitled to reasonable compensation from the estate" for costs advanced).[7] As the circuit court determined, the fact that

---

7. The Petitioners contend, on the other hand, that if the Conservator would have prevailed in the lawsuit against Roland and Susan and recovered the property wrongfully transferred, the attorney fees incurred by both the Petitioners and the Conservator could be recovered from Roland and Susan. They cite SDCL 15-17-38, which authorizes a court to award attorney fees in guardianship proceedings, and this Court's holding in *In re Guardianship of Rich*, 520 N.W.2d 63, 69–70 (S.D. 1994), which upheld an award of fees assessed against a beneficiary. In response, Roland and Susan note that the attorney fees recovered by the estate in *Rich* were awarded in the *guardianship proceeding*, not a collateral civil suit, as we have here. Roland and Susan further counter that they could be the ones awarded attorney fees from the estate if they prevail in the lawsuit. The parties have not cited or explained what impact our more recent case, *In re Estate of Ducheneaux*, 2018 S.D. 26, 909 N.W.2d 730, may have on this attorney fee issue.

(continued . . .)

significant attorney fees (over $80,000) had already been incurred by the Conservator, "especially in light of the speculative prospect of prevailing on the claim[,]" was "itself a persuasive argument _for_ settlement[.]"

[¶38.]     Finally, the circumstances surrounding the settlement support the circuit court's conclusion that the settlement was fair, reasonable, and in the best interest of the estate.  Because of the strained family relationships, the circuit court appointed a neutral and objective conservator to look out for Almon's best interests and to carry out his intent.  Unlike cases involving family discord where a potential beneficiary is charged with these tasks, there is no suggestion of any fraud or collusion in reaching the settlement here.  *See, e.g.*, *In re IBP, Inc. Sec. Litig.*, 328 F.Supp.2d 1056, 1064 (D.S.D. 2004) (approving settlement in part because the settlement negotiations were at arm's length and without evidence of bad faith or collusion).  Both parties to the lawsuit were represented by counsel, and the settlement was reached with the assistance of an experienced mediator.  We find no abuse of discretion in the circuit court's approval of the settlement.

### *Appellate Attorney Fees*

[¶39.]     Roland and Susan petitioned this Court for an award of $10,933.29 in appellate attorney fees from the estate and filed the requisite affidavit and itemized statement of legal services rendered.  *See* SDCL 15-26A-87.3.  They contend that such fees are allowable under SDCL 15-17-38 and SDCL 29A-5-116.  They assert

---

(. . . continued)

> We need not resolve the debate over who might be left picking up the tab for additional attorney fees here, however, because we find the circuit court's overall assessment of the prosecutorial merit of the case to be well grounded.

that by defending the circuit court's order allowing the "Conservator to settle costly and risky litigation[,]" their counsel's services benefited Almon and his estate.

[¶40.] The Conservator and Petitioners object to the motion and assert that Roland and Susan's actions did not benefit Almon or his estate. According to the Petitioners, "[t]he only people who received a benefit in defending this appeal, and the settlement, are [Roland and Susan] because it allows them to potentially avoid significant liability in the lawsuit." Similarly, the Conservator claims that Roland and Susan failed to establish that their services "in responding to this appeal substantially benefitted the protected person in light of their original actions which initially precipitated the lawsuit." In the Conservator's view, an award of attorney fees to Roland and Susan "would inappropriately offset a substantial portion of the amount [Roland and Susan] agreed to pay Almon . . . in settlement of Almon's lawsuit against them."

[¶41.] Relevant here, SDCL 29A-5-116 provides that "[t]he court may also award reasonable compensation to any attorney whose services *resulted in an order that was beneficial to the minor, the protected person, or the estate.*" (Emphasis added.) *See also* SDCL 15-17-38 (providing that "[t]he court may award attorneys' fees from trusts administered through the court as well as in probate and guardianship proceedings"). While Roland and Susan participated in the appeal and offered arguments in addition to the Conservator's for why this Court should affirm the circuit court's decision approving the settlement, we cannot ignore that the settlement agreement exists solely because of their alleged improper conduct in their relationship with Almon. Also, their participation in this appeal was not

necessary to defend the settlement.  Therefore, we decline to award Roland and Susan appellate attorney fees from Almon's estate.

[¶42.]     Affirmed.

[¶43.]     KERN, SALTER, and MYREN, Justices, and SOGN, Circuit Court Judge, concur.

[¶44.]     SOGN, Circuit Court Judge, sitting for JENSEN, Chief Justice, disqualified.